ELIZABETH C. PRITZKER (SBN: 146267)
BETHANY L. CARACUZZO (SBN: 190687)
SHIHO YAMAMOTO (SBN: 264741)
**PRITZKER | LAW**
633 Battery Street, Suite 110
San Francisco, CA 94111
Telephone: (415) 692-0772
Facsimile: (415) 366-6110
Email: ecp@pritzker-law.com;
        bc@pritzker-law.com;
        sy@pritzker-law.com

BRUCE L. SIMON (SBN: 96241)
ROBERT G. RETANA (SBN: 148677)
AARON M. SHEANIN (SBN: 214472)
**PEARSON, SIMON & WARSHAW, LLP**
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Telephone: (415) 433-9000
Facsimile: (415) 433-9008
Email: bsimon@pswlaw.com;
        rretana@pswlaw.com;
        asheanin@pswlaw.com

*Attorneys for Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Il Fornaio (America) Corporation, Oliveto Partners, Ltd., and The Famous Enterprise Fish Company Of Santa Monica, Inc., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Lazzari Fuel Company, LLC, California Charcoal And Firewood, Inc., and Chef's Choice Mesquite Charcoal,<br><br>Defendants. | Case No:<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Il Fornaio (America) Corporation, Oliveto Partners, Ltd., and The Famous Enterprise Fish Company of Santa Monica, Inc., ("Plaintiffs"), on behalf of themselves and all others similarly situated (the "Class" as defined below), upon personal knowledge as to the facts pertaining to themselves and upon information and belief as to all other matters, and based on the investigation of counsel, bring this class action for damages, injunctive and other relief, and allege as follows:

## NATURE OF THE CASE

1.      This is a class action lawsuit against Defendants Lazzari Fuel Company, LLC, California Charcoal and Firewood, Inc., and Chef's Choice Mesquite Charcoal (all as defined below, and collectively referred to herein as "Defendants"), for engaging in at least a ten-year conspiracy to fix, raise and/or stabilize prices, and allocate the market and customers in the United States for Mesquite Lump Charcoal (defined below), in violation of state and federal antitrust laws.

2.      Defendants are distributors of Mesquite Lump Charcoal for commercial food preparation and restaurant use in the United States.  Mesquite charcoal is a natural charcoal made from the mesquite tree, a deciduous hardwood tree that grows primarily in the Sonoran Desert of Mexico. Mesquite charcoal is primarily produced in Mexico, where it is sold to charcoal brokers and transported to the United States.

3.      Restaurants and commercial food preparation companies provide the primary market for mesquite charcoal in the United States.  Mesquite charcoal is favored by restaurants and commercial chefs because it burns slowly, reaches a high heat desired for searing, and releases a rich scent that permeates grilled foods.

4.      Most mesquite charcoal sold in the United States is packaged and sold in 40 pound bags for commercial or restaurant use.  As used herein, the term "Mesquite Lump Charcoal" refers to mesquite charcoal that is packaged, distributed and sold in 40 pound bags for commercial or restaurant use.  Defendants distribute and sell Mesquite Lump Charcoal directly to restaurants, commercial food preparers and restaurant supply companies.

5.      Plaintiffs allege that, for at least the 10-year period from January 2000 through and including September 2010, Defendants conspired, combined, contracted for, or agreed: (a) to fix, raise or stabilize the price of Mesquite Lump Charcoal in the United States; (b) to not compete for each

other's customers; (c) to allocate specific customers or territories among themselves; (d) to sell only to customers in certain geographic areas; (e) to refrain from submitting bids for the sale of Mesquite Lump Charcoal to customers allocated to a co-conspirator company; and/or (f) to communicate with each other regarding what price to bid for the sale of Mesquite Lump Charcoal and then submit agreed-upon, noncompetitive bids to each other's customers.

6.      As described by William W. Lord—the owner of Chef's Choice Mesquite Charcoal and a major participant in the conspiracy—in an audio tape recording obtained by federal prosecutors, the intent, purpose and effect of Defendants' conspiratorial agreement was to give "respect" to each member of the conspiracy and to "get the price up" for Mesquite Lump Charcoal.  Lord subsequently pleaded guilty to criminal antitrust charges, paid a $100,000 fine, and served a four-month prison term for his company's role in the conspiracy.

7.      Plaintiffs are restaurants and commercial food distributors that purchased Mesquite Lump Charcoal directly from one of the Defendants at artificially-inflated prices during the pendency of the conspiracy.  As a direct and proximate result of the unlawful conduct and price-fixing of Defendants alleged herein, Plaintiffs and other members of the Class (defined below) have paid more for Mesquite Lump Charcoal than they otherwise would have paid in a competitive market, and therefore have been injured in their respective businesses or property.

8.      Plaintiffs bring this class action lawsuit pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover damages suffered by the Class (defined below) and the costs of suit, including reasonable attorneys' fees; to enjoin Defendants' anticompetitive conduct; and for such other relief as is afforded under the antitrust laws of the United States for Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Plaintiffs assert claims on behalf of themselves and the following proposed Class:

> "All persons in the United States who purchased Mesquite Lump Charcoal directly from any Defendant, and/or their subsidiaries and co-conspirators, during the period from and including January 2000 through at least September 30, 2011 (the 'Class Period').

**JURISDICTION AND VENUE**

9.      Plaintiffs bring this action to recover damages, including treble damages, costs of suit and reasonable attorneys' fees, as well as injunctive relief, arising from Defendants' violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

10.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337 and pursuant to 15 U.S.C. §§ 15, 26.

11.     Venue is proper is this district pursuant to 28 U.S.C. §§ 15, 22 and 26, and pursuant to 28 U.S.C. 28 U.S.C. § 1391 (b), (c) and (d), because, at all times relevant to the Complaint, Defendants transacted business, were found, or had agents present in the district; (b) a substantial part of events giving rise to Plaintiffs' claims occurred in this district; and (c) a substantial portion of the affected interstate trade and commerce described below has been carried out in the district.

**PARTIES**

**A.      Plaintiffs**

12.     Plaintiff Il Fornaio (America) Corporation ("Il Fornaio") is a Delaware corporation its principal place of business located at 770 Tamalpais Drive, Suite 400, Corte Madera, CA 94925.  Il Fornaio owns and operates 21 full service restaurants, including restaurants operating in the following cities:  Burlingame, CA; Carmel, CA; Corte Madera, CA, Denver, CO; Irvine, CA; Las Vegas, NV; Manhattan Beach, CA; Palo Alto, CA; Portland, OR, Roseville, CA; Sacramento, CA; San Francisco, CA; San Jose, CA; and Walnut Creek, CA.  During the Class Period, Il Fornaio purchased Mesquite Lump Charcoal directly from one or more of the Defendants and has suffered pecuniary injury as a result of the antitrust violations alleged herein.

13.     Plaintiff Oliveto Partners, Ltd. ("Oliveto") is a California limited partnership with its principal place of business located at 5681 Florence Terrace, Oakland, California, 94111, and operating as the restaurant, Oliveto Café & Restaurant, located in Oakland, California.  During the Class Period, Oliveto purchased Mesquite Lump Charcoal directly from one or more of the Defendants and has suffered pecuniary injury as a result of the antitrust violations alleged herein.

14.     Plaintiff The Famous Enterprise Fish Company of Santa Monica, Inc. ("Enterprise Fish") is a California corporation with its principal place of business located at 174 Kinney Street,

Santa Monica, California 90405, and operating under the restaurant name, Enterprise Fish Company. During the Class Period, Enterprise Fish purchased Mesquite Lump Charcoal directly from one or more of the Defendants and has suffered pecuniary injury as a result of the antitrust violations alleged herein.

### B.  Defendants

16.  Defendant Lazzari Fuel Company, LLC ("Lazzari") is a California limited liability company founded in 1908, with its principal place of business located at 11 Industrial Way, Brisbane, CA, 94005.  Lazzari holds itself out on its company website as the "nation's leading supplier of premium natural charcoal," including the company's "most popular and best-selling food service Mesquite Lump Charcoal."  During the Class Period, Lazzari distributed and directly sold Mesquite Lump Charcoal in the United States.

17.  Defendant California Charcoal and Firewood, Inc. ("California Charcoal") is a California corporation with its principal place of business at 1518 S. Eastern Ave., City of Commerce, CA, 90022.  During the Class Period, California Charcoal distributed and directly sold Mesquite Lump Charcoal and other cooking fuel products in the United States.

18.  Defendant Chef's Choice Mesquite Charcoal ("Chef's Choice") is a sole proprietorship with its principal place of business located at 1729 Ocean Oaks Road, Carpinteria, CA, 93013.  Chef's Choice is owned and operated by William W. Lord ("Lord").  During the Class Period, Chef's Choice distributed and directly sold Mesquite Lump Charcoal in the United States.

### CO-CONSPIRATORS

19.  Various other persons, firms, corporations or entities may have participated as unnamed co-conspirators with Defendants in the violations and conspiracy alleged herein.  In order to engage in the offenses charged and violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein.

20.  At all relevant times, each Defendant was an agent of each of the remaining defendants and, in doing the acts alleged herein, was acting within the course and scope of such agency.  Each Defendant ratified and/or authorized the wrongful acts of each of the Defendants.  Defendants, and each of them, are individually sued as participants and as aiders and abettors in the improper acts and

transactions that are the subject of this action.

## INTERSTATE TRADE AND COMMERCE

21.     The business activities of Defendants that are the subject of this action were within the flow of, and substantially affected, interstate trade and commerce.

22.     During the Class Period, Defendants distributed and sold substantial quantities of Mesquite Lump Charcoal in a continuous and uninterrupted flow of interstate commerce throughout the United States.

## FACTUAL ALLEGATIONS

### A.     The Mesquite Lump Charcoal Market

23.     Mesquite charcoal is a natural charcoal derived from the mesquite tree, a deciduous hardwood tree that exists primarily in the Sonoran Desert of Mexico.  Mesquite charcoal production occurs primarily in Mexico, where mesquite wood is collected and hauled, loaded into kilns, burned, unloaded, bagged, loaded into 44,000 pound containers, and transported to charcoal brokers for resale to distributors.  According to industry reports, at least 95 percent of mesquite charcoal transported to and sold in the United States is removed from the Sonoran Desert.

24.     Cooking with mesquite charcoal became popular in the mid-1980's. Since then, many restaurants and popular commercial food producers advertise menus that include mesquite-grilled steaks, chicken or fish.

25.     Mesquite charcoal is favored by chefs because it burns slowly, reaches a high heat desired for searing, and releases a rich scent that permeates grilled foods.  Burning mesquite charcoal also is popular because it is a smokeless barbeque technique.

26.     The primary market for mesquite charcoal in the United States is restaurants and commercial food producers.   Mesquite charcoal is packaged and sold in 40 pound bags for commercial or restaurant use.  This 40 pound-bag of commercial/restaurant grade mesquite charcoal is referred to herein as "Mesquite Lump Charcoal."

27.     At all relevant times, Defendants dominated the United States Mesquite Lump Charcoal market.  Defendants accounted for roughly 75 percent of sales of Mesquite Lump Charcoal in the United States during the period January 2000 through September 2010. The total market share

CLASS ACTION COMPLAINT

of the Defendants during that period was as follows: Lazzari – 42%; Chef's Choice – 19%; and California Charcoal – 14%, for a total of 75% of sales during that period.   Defendants' collective revenues for Mesquite Lump Charcoal during this same period totaled between $6.0 million and $9.3 million, annually, for a total estimated revenue during the Class Period of approximately $100 million.

**B.      The Conspiracy to Fix Mesquite Lump Charcoal Prices**

28.      Beginning as early as January 2000 and continuing until at least September 2010, Defendants abused their market dominance, and conspired, combined, contracted for or agreed to fix, raise or stabilize the price of Mesquite Lump Charcoal in the United States.

29.      Starting in January 2000, Defendants established a practice where they would communicate and reach an understanding not to compete for each other's customers.   Plaintiffs are informed and believe that this agreement not to compete was reached and implemented by high-ranking officials for each Defendant, including William Lord ("Lord"), the owner of Chef's Choice; Marvin Ring ("Ring"), CEO of California Charcoal; Robert Colbert ("Colbert"), Vice President and owner of Lazzari; and Richard Morgen ("Morgen"), Lazzari's General Manager.

30.      Defendants implemented the agreement and carried out the price-fixing conspiracy by (1) allocating existing customers based on existing relationships and agreeing not to compete for each other's customers, (2) submitting intentionally non-competitive bids to each other's customers if contacted, and (3) communicating with each other regarding what price to bid and then submitting the agreed-upon, noncompetitive bids to each other's customers. This agreement allowed each Defendant and co-conspirator to continue a strong and profitable business relationship with its existing customers, without the need to compete on price in order to retain that customer's business.

31.      With respect to new customers, Defendants agreed that new purchases of Mesquite Lump Charcoal would be allocated to a particular Defendant or co-conspirator based on geographic location.  For example, in accordance with the conspiracy, a new customer in the San Francisco Bay Area would be allocated to Lazzari, and Chef's Choice and California Charcoal would then agree refrain from competing with Lazzari for the new customer's business.  Similarly, if a prospective client located in Northern California called California Charcoal, it was agreed by and among the Defendants and their co-conspirators that the customer would be directed to Lazzari.  Thus, it was

agreed that each Defendant had an allocated set of customers, and the other Defendants would not compete for these customers' business.

32.     The conspiracy was carried out primarily through telephone conversations among high-ranking executives from each Defendant company.  The Defendants discussed the allocation of particular customers, communicated with each other regarding what price to quote a customer located in a co-conspirator's geographic region, and discussed the amount of any agreed-upon noncompetitive bid provided to customers allocated to other Defendants or co-conspirators.  These discussions took place on a regular basis, approximately once every quarter, as well as on specific, ad-hoc occasions, from approximately January 2000 until at least September 2010.

**C.     Defendants' High-Ranking Executives Explain How the Defendants Conspired to Allocate Customers, Rig Bids and Fix Prices for Mesquite Lump Charcoal**

33.     The owner of Chef's Choice, William Lord, was the king pin of the conspiracy.  Lord facilitated and directly participated in the long-running price-fixing and customer allocation conspiracy alleged herein relating to Mesquite Lump Charcoal.

34.      Lord detailed his role implementing and participating in the price-fixing and customer allocation conspiracy in interviews and audio-taped recordings obtained by federal antitrust authorities.  In an encrypted transcript of phone conversation with a confidential informant taped by federal investigators, Lord described his relationship with his co-conspirators, explaining:

> **"I always, at least in the past, I've called [Individual A] and called, uh, [Individual B] at [Company B] whenever a situation came up prior to, you know, having to make a move or something like that**."

On information and belief, and based on the investigation of counsel, Plaintiffs allege the person identified by Lord as "[Individual A]" in the above-described portion of the encrypted transcript is Marvin Ring, CEO of California Charcoal, and "[Individual B] at [Company B]" is Robert Colbert, the Vice President of Lazzari.

35.     Lord expanded upon the operation of the conspiracy in the same phone call with the confidential informant recorded by federal prosecutors:

"I called [Individual B] before, or [Individual C] before, or [Individual A] and, uh, we all have kinda just left things alone throughout the years. **Um, I know where his customers are, he knows where mine are, but for some reason, just a phone call or what should we, what should I quote so that it will, you know, make you look okay**. Like that. **That's pretty much been the conversation through the years.** Because, ahh, **all of us have raised our prices before and what happens is the com-, the company calls and says can they get it at a better price. And so we've always, uh, kept each other's backs in a sense**."

On information and belief, and based on the investigation of counsel, Plaintiffs allege the person identified by Lord as "[Individual B]" is Robert Colbert, Vice President and co-owner of Lazzari; the person identified as "[Individual C]" is Richard Morgen, Lazzari's General Manager and co-owner; and the person identified as "[Individual A]" is Marvin Ring, CEO of California Charcoal.

36.     In the same recorded conversation, when the confidential informant asked Lord how he could "co-exist" with his competitor, Defendant Lazaari, Lord replied:

"**Simply by communicating with each other like I just did right now**. I mean if he said, hey I've been selling this guy for 12 years, I'd say hey, I'm sorry, I didn't…I didn't know it, they called me and they asked me for a price, but that happened a long time ago. **Now, when anybody calls me for a price, I call one of three…two people…two other people and ask 'em, 'Hey, are you selling to this person cause they're pricing me out?**"

37.     When the confidential informant asked which "two other people" Lord would call, Lord's answer, as described in the encrypted transcript recorded by federal prosecutors, was "either [Individual B] or [Individual A]." On information and belief, and based on the investigation of counsel, Plaintiffs allege the person identified by Lord to federal prosecutors as "[Individual B]" is

Lazzari Vice President/co-owner Robert Colbert, and "Individual A]" is Marvin Ring, the CEO of California Charcoal.

38.     Lord [owner of Defendant Chef's Choice] similarly described how he and his co-conspirators implemented the conspiracy over the years in a phone conversation with a co-conspirator that also was recorded by federal prosecutors:

> "And, you and I and [Individual A] have done this, we've talked to each other. **And, you know what I mean we've done it, its noth— it's nothing new…it's nothing new…. And we've respected each other, and we call each other if something comes up.** And…like that, like that. **Like, every once in a while Modesto calls. I mean they look…and I just…I know how to high to ball it…you know…so that if you've raised your price, I – you probably have – they call me or somebody calls me. I just tell them something crazy.**"

39.     Lord reiterated during the call with his co-conspirator:

> "**You know these guys, you give him a price increase and they go and look**. Right? **So they call…and I just…and [Individual A] does the same thing…he calls me up he says, 'hey, I…I…what should I tell them?' And I tell him…that's that...it's done**."

40.     On information and belief, and based on the investigation of counsel, the co-conspirator on the call with Lord is Defendant Lazzari's Vice President/co-owner, Robert Colbert, and the person identified by Lord as "[Individual A] in the encrypted transcript recorded by federal prosecutors is Marvin Ring, the CEO of California Charcoal.

41.     Lord, the owner of Chef's Choice, subsequently pleaded guilty to criminal antitrust charges stemming from his company's role in the long-standing customer allocation, bid-rigging and Mesquite Lump Charcoal price-fixing conspiracy entered into by Defendants. In his plea agreement, Lord admits the long-standing nature and purpose of the conspiracy:

> During the relevant period, Defendant [Lord of Chef's Choice]

participated in a combination and conspiracy with Individuals A, B, and C, as well as Companies A and B, **the primary purpose of which was to suppress and restrain competition**. In furtherance of the conspiracy, **Defendant engaged in conversations with Individuals A, B, and C and Companies A, and B not to compete for each other's customers for the sale of mesquite charcoal in the United States. The purpose of the conspiracy was to prevent conspirators from having to reduce prices in the face of competition in order to retain their customers**. The agreement continued in operation until in or about September 2010. [1]

42.     Lord's plea agreement identifies "Individual A" as the owner and president of "Company A, a Los Angeles-based company that sold and distributed mesquite charcoal," and further identifies "Individual B" as the General Manager and part owner of "Company B, a San Francisco-based mesquite charcoal distributor." "Individual C" is described in the plea agreement as "a part owner of, and executive with, Company B." On information and belief, and based on counsel's investigation, Plaintiffs allege that "Company A," as referenced in the plea agreement, is Defendant California Charcoal, located in City of Commerce, and that "Individual A" is California Charcoal's CEO, Marvin Ring. Plaintiffs further allege that the entity described as "Company B" in the plea agreement is Defendant Lazzari, located in Brisbane, California, and that the persons identified in the plea agreement as "Individuals B and C" are Robert Colbert and Richard Morgen, Lazzari's Vice President and General Manager, respectively.

---

[1]     The plea agreement prepared for Lord by the U.S. Department of Justice suggests that Defendants California Charcoal and Lazzari "voluntarily withdrew" from the conspiracy in or about September 2010. Lord apparently was unaware that Defendants had done so and, when his conversations with co-conspirators were recorded by federal prosecutors in September 2011—one year later—Lord understood and believed that Defendants' price-fixing conspiracy remained in full effect.

43.     Lazzari's co-owners, Vice President Robert Colbert, and General Manager Richard Morgen, also have attested to Lazzari's active involvement in the long-standing conspiracy. According to the Sentencing Memorandum prepared by the U.S. Department of Justice ("DOJ") in the criminal antitrust proceedings against Chef's Choice William Lord:

> "Individuals B and C both confirmed [Lord's] involvement in the 2005 incident regarding the Modesto customer [referenced in the recorded phone conversation between Lord and a co-conspirator], and also detailed another incident from the Spring of 2007.  At that time, [Lord] informed Individual C that Chef's Choice had lost a long-time customer to a new competitor, and provided Individual C with the price Chef's Choice had offered the customer.  Individuals B and C decided that since [the] customer no longer belonged to Chef's Choice, it no longer was subject to their agreement with [Lord].  Thus, they approached the customer, provided a quote slightly lower than [Lord] had offered, and won the business.  [Lord] subsequently contacted Individual B**, noted their relationship had been good for everyone, and explained that by bidding for the customer, Individuals B and C had 'betrayed' [Lord].**  Shortly thereafter, **Individual C contacted [Lord], provided him the price Company B quoted to the customer, and indicated that if [Lord] wished to quote the lower price, Company B would not fight to keep the account**."

44.     On information and belief, and based on the investigation of counsel, Plaintiffs allege that the persons referenced in the DOJ's Sentencing Memorandum as "Individuals B and C" are Robert Colbert, Lazzari's Vice President, and Richard Morgen, Lazzari's General Manager, respectively, and that "Company B" is Defendant Lazzari.

45.     Plaintiffs further allege, on information and belief, and based on the investigation of counsel, that the Modesto customer referenced in the Sentencing Memorandum is Sysco Central California, Inc., of Modesto, California.  Pursuant to the long-standing conspiracy, Defendants conspired, combined and agreed among themselves to allocate the Mesquite Lump Charcoal business of Sysco Central California, Inc. to Defendant Chef's Choice.  In furtherance of said conspiracy,

Defendants shared commercially-sensitive bids and pricing information for Mesquite Lump Charcoal, communicated with each other regarding what price for Mesquite Lump Charcoal to quote customers they had agreed to allocate, discussed the amount of any agreed-upon noncompetitive bids to be provided to the customer, and agreed not to compete for the Mesquite Lump Charcoal business of customers allocated to other co-conspirators.

46.     In addition to the specific acts of the conspiracy referenced in the DOJ's Sentencing Memorandum, based on the independent investigation of counsel, Plaintiffs are aware of at least two additional specific communications among the Defendants that reveal the nature and purpose of Defendants' price-fixing conspiracy for Mesquite Lump Charcoal, and the manner in which the Defendants carried out the conspiracy.

47.     For example, Plaintiffs allege that, in or about 2004, William Lord, owner of Defendant Chef's Choice and Marvin Ring, CEO of California Charcoal had a phone conversation in which Lord told Ring that he was going to submit a bid for Mesquite Lump Charcoal to El Torito Grill, located in Brea, California.  Ring emphasized with Lord that El Torito Grill was an existing Mesquite Lump Charcoal customer of Defendant California Charcoal and that, pursuant to the Defendants' long-standing customer allocation and price-fixing agreement, Lord should not submit a competitively-priced bid to El Torito Grill.  Plaintiffs further allege, on information and belief, and based on the investigation of counsel, that Chef's Choice abided by the terms of the parties' conspiracy and agreed with California Charcoal that Chef's Choice would not submit a competitive bid for Mesquite Lump Charcoal to El Torito Grill.

48.     Similarly, in, or about November or December 2009, a sales representative from Defendant Lazzari, unbeknownst to Lazzari senior management, scheduled a meeting with food distributor, Rohrer Brothers, Inc., in an attempt to gain the company's Mesquite Lump Charcoal business for Lazzari.  At the time, pursuant to the Defendants' long-standing customer allocation and price-fixing agreement, Rohrer Brothers was an allocated customer of Defendant Chef's Choice. Upon learning of the sales representative's contact, Chef's Choice's owner, William Lord, phoned Richard Morgen, Lazzari's General Manager, to reiterate that Rohrer Brothers was a Chef's Choice customer, stating, "Are we at war?" or words to that effect.  Morgen assured Lord that the two

companies were not "at war," that Lazzari's sales representative had scheduled the meeting with Rohrer Brothers solely for the purpose of discussing the sales potential of products other than Mesquite Lump Charcoal.  After assuring Lord that the parties' agreed-upon market allocation and price-fixing agreement was still in place, Morgen instructed the Lazzari sales representative to "never contact" Rohrer Brothers again, because "that's the way it works."  On information and belief, based on the investigation of counsel, Plaintiffs allege that Morgen's statement, "that's the way it works," was intended to acknowledge and underscore that Defendants had a pre-existing agreement to allocate customers and not complete for each other's Mesquite Lump Charcoal business.

**D.     The Conspiracy Was Long-Standing and Enabled Defendants and Their Co-Conspirators to Inflate Mesquite Lump Charcoal Prices for at Least a Decade**

49.     The conspiracy in this case lasted *at least 10 years* – and possibly longer.

50.     As stated at the outset of this Complaint, and as detailed in the preceding paragraphs, Plaintiffs allege that, for at least the 10-year period from January 2000 through and including September 2010, Defendants conspired, combined, contracted for, or agreed: (a) to fix, raise or stabilize the price of Mesquite Lump Charcoal in the United States; (b) to not compete for each other's customers; (c) to allocate specific customers or territories among themselves; (d) to sell only to customers in certain geographic areas; (e) to refrain from submitting bids for the sale of Mesquite Lump Charcoal to customers allocated to a co-conspirator; and (f) to communicate with each other regarding what price to bid for the sale of Mesquite Lump Charcoal and then submit agreed-upon, noncompetitive bids to each other's customers.

51.     Moreover, Defendants' conspiracy affected millions of dollars in Mesquite Lump Charcoal sales.  The conspiracy allowed Defendants and their co-conspirators to maintain inflated prices for Mesquite Lump Charcoal sales and avoid a pricing war.

52.     Chef's Choice's owner, William Lord, admitted in the plea agreement in which he pleaded guilty to criminal antitrust charges that "the purpose" of the Defendants' long-standing conspiracy "was to prevent the conspirators from having to reduce prices [for Mesquite Lump Charcoal] in the face of competition in order to retain their customers."

53.     As described in a phone conversation recorded by federal prosecutors, moreover,

Defendants' long-standing price-fixing and customer allocation arrangement achieved its goal. During a call with Robert Colbert, Lazzari's Vice President, captured on audio tape by federal prosecutors, Chef's Choice's owner, William Lord, complained that the proposed entrance into the market of a new competitor [the confidential informant] would make it difficult for Defendants to maintain the high prices for Mesquite Lump Charcoal they had enjoyed during the long-standing pendency of the conspiracy:

> "**I mean, I've taken time to push the price up and, the only three people involved are you, me and [Individual A]**.   And so **now we have somebody else [the confidential informant] who's trying to low ball and make it hard**.

***

> "**We're good for years, and years, and years, and I don't see any reason for [us] not to continue**…. Especially in these economic times.  **It's not time to have a war, I'll tell ya**."

On information and belief, and based on the investigation of counsel, Plaintiffs allege that the person identified as "[Individual A]" in the encrypted audio recording captured by federal prosecutors is Marvin Ring, CEO of California Charcoal.

54.     Similarly, in a separate phone call between Lord and the confidential informant captured on tape by federal prosecutors, Chef's Choice's owner, William Lord, explained the dangers of letting customers leverage Mesquite Lump Charcoal prices by having Defendants compete with one another on price, stating:

> "**[M]e and [Company B] and [Individual A] have kept the price up and not let that happen.**"

On information and belief, and based on the investigation of counsel, Plaintiffs allege that the entity identified as "[Company B]" in the federal prosecutors' encrypted transcript is Defendant Lazzari, and that the person identified as "[Individual A]" is Marvin Ring, CEO of California Charcoal.

**E.     Market Factors A Support the Existence of a Conspiracy**

55.     Various market factors made the market for Mesquite Lump Charcoal highly susceptible to anti-competitive practices, collusion and price-fixing, which allowed Defendants to

implement and maintain their long-standing, anticompetitive conspiracy.

### 1)   *Limited Competition*

56.   As a result of Mesquite Lump Charcoal's characteristics – a natural charcoal, harvested from mesquite forests primarily located in the Sonoran Desert of Mexico, with burning and food flavoring qualities – it is a product favored by restaurants and commercial food purveyors that rely on Mesquite Lump Charcoal for their mesquite-grilled and barbequed foods.

57.   Defendants—all of whom are based in California—collectively represent the overwhelming majority (75%) of Mesquite Lump Charcoal distributors in the United States.

### 2)   *Inelastic Demand Due to Lack of Substitutes*

58.   "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other.  For example, demand is said to be "inelastic" if an increase in the price of a product results in little or no decline in the quantity sold of that product.  In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

59.   For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices.  Otherwise, increase prices would result in declining sales, revenues and profits, as customers purchased substitute products or declined to buy altogether.

60.   Demand for Mesquite Lump Charcoal is relatively inelastic.  While other natural hardwood charcoals—such as white oak or hickory—are available, these alternative charcoals have burn rates and impart a flavor into grilled meats, poultry, fish and other foods that differs from Mesquite Lump Charcoal.  Comparing Mesquite Lump Charcoal to alternative hardwood charcoals in terms of quality, burn characteristics and flavor profiles, there is not an acceptable substitute product.

## <u>DEFENDANTS' ACTIVE CONCEALMENT OF THE CONSPIRACY TOLLED THE STATUTE OF LIMITATIONS</u>

61.   Plaintiffs did not discover and could not discover through the exercise of reasonable diligence the existence of the price-fixing conspiracy alleged herein until, at the earliest, approximately September 2012. At that time, admissions and other information were contained in the plea agreement entered in the criminal proceedings involving Chef's Choice's owner, William Lord.

62.     Since the start of the Class Period, Defendants and their co-conspirators committed continuing violations of the antitrust laws resulting in monetary injury to Plaintiffs and Class members. These violations each constituted injurious acts.

63.     In addition, Defendants kept secret their agreement, understanding and conspiracy to: (a) inflate the price of Mesquite Lump Charcoal; (b) not compete for each other's customers; (c) allocate specific customers or territories among themselves; (d) sell only to customers in certain geographic areas; (e) refrain from submitting bids for the sale of Mesquite Lump Charcoal to customers allocated to a co-conspirator; and/or (f) communicate with each other regarding what price to bid for the sale of Mesquite Lump Charcoal and then submit agreed-upon, noncompetitive bids to each other's customers.  As a result, Plaintiffs and Class members were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for Mesquite Lump Charcoal in the United States throughout the Class Period.

64.     Neither Defendants nor their co-conspirators told Plaintiffs or other Class members that they were fixing prices and allocating customers for Mesquite Lump Charcoal, or engaging in the other unlawful collusive practices alleged herein.  By its very nature, the conspiracy by Defendants, which was conducted using telephonic or other private communications, was inherently self-concealing.

65.     In the alternative, application of the doctrine of fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiffs and the Class.

66.     Defendants and their co-conspirators affirmatively and fraudulent concealed their unlawful conduct.  Plaintiffs and Class members did not discover, nor could have discovered through reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws until, at the earliest, approximately September 2012--when the plea agreement in the criminal proceedings against Chef's Choice's owner, William Lord, first shed light on the nature, extent and means by which Defendants effectuated the conspiracy—because Defendants and their co-conspirators used deceptive and secret methods, including telephonic and other private communications, to affirmatively conceal their violations.  Before that time, Plaintiffs and Class members were unaware of Defendants' unlawful conduct, and did not know they were paying inflated prices for Mesquite Lump Charcoal

during the Class Period.

67.     Additionally, as described above, the affirmative acts of the Defendants and their co-conspirator as alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  Plaintiffs and members of the Class could not have discovered the price-fixing, customer allocation and bid-rigging conspiracy alleged herein at any time prior to September 2012, at the earliest, by the exercise of reasonable diligence because of the Defendants' deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detention of and/or fraudulently conceal their conspiracy.

68.     For these reasons, the statute of limitations as to Plaintiffs and the Class' claims did not begin to run, and has been tolled with respect to the claims that Plaintiffs and the members of the Class have alleged in this Complaint.

## ANTI-TRUST INJURY

69.     During the Class Period, the unlawful contract, combination, agreement and/or conspiracy alleged in this Complaint had, *inter alia*, the following effects:

        a.      Prices charged by Defendants and their co-conspirators to Plaintiffs and members of the Class for Mesquite Lump Charcoal have been inflated and/or maintained at artificially high and supracompetitive levels;

        b.      Plaintiffs and members of the Class have been required to pay more for Mesquite Lump Charcoal than they would have paid in a competitive marketplace unfettered by Defendants' collusive and unlawful price-fixing;

        c.      Plaintiffs and members of the Class have been deprived of the benefits of free, open and unrestricted competition in the market for Mesquite Lump Charcoal;

70.     During and throughout the Class Period, Plaintiffs and members of the Class directly purchased Mesquite Lump Charcoal in the United States.

71.     Plaintiffs and the other Class members paid more for Mesquite Lump Charcoal than they would have paid under conditions of free and open competition.

72.     As a direct and proximate result of the illegal combination, contract or conspiracy alleged in this Complaint, Plaintiffs and the members of the Class were injured and financially

damaged in their businesses and property, in amounts to be determined at trial.

73.     Plaintiffs and members of the Class suffered the type of antitrust injury that the federal laws were meant to punish and prevent.

## CLASS ACTION ALLEGATIONS

74.     Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure 23 on behalf of the following Class:

> All persons in the United States who purchased Mesquite Lump Charcoal directly from any Defendant, and/or their subsidiaries and co-conspirators, during the period from and including January 2000 through at least September 20, 2011 (the "Class Period").

75.     Excluded from the Class are (1) Defendants and their co-conspirators; (2) any entity in which Defendants have or had a controlling interest; (3) Defendants' officers, directors, and employees; (4) members of Defendants' immediate families and legal representatives, successors, and assigns; and (5) any judge assigned to this matter, together with his or her immediate family members.

76.     This action has been brought and may properly be maintained on behalf of the Class proposed above under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

77.     **Numerosity.**  Members of the Class are so numerous that their individual joinder is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of Class members.  Plaintiffs also believe that Class members are sufficiently numerous and geographically dispersed that joinder of all Class members is impracticable.

78.     **Existence and predominance of common questions**.  Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual Class members.  These common questions include:

> a.     Whether Defendants engaged in a contract, combination or conspiracy to fix, maintain or stabilize the prices of, or allocate the market for, Mesquite Lump Charcoal distributed and sold in the United States;

> b.     Whether the alleged contract, combination or conspiracy violated Section 1 of

the Sherman Act as alleged in the Prayer for Relief below;

   c. Whether Defendants' conduct as alleged herein caused Plaintiffs and Class members to pay more for Mesquite Lump Charcoal than they otherwise would have paid in an unrestrained, competitive market; and

   d. Whether Plaintiff and other members of the Class were injured by the conduct of Defendants and, if so, the appropriate class-wide measure of damages and appropriate relief.

  79. **Typicality**.  Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs, like other Class members, purchased Mesquite Lump Charcoal directly from one of the Defendants; lost money or property and/or was damaged as a result of the same wrongful conduct of the Defendants as alleged herein; and seeks relief common to the Class.

  80. **Adequacy**.  Plaintiffs are an adequate representative of the Class because their interests do not conflict with the interests of the members of the Class they seek to represent.  Plaintiffs have retained counsel competent and experienced in complex class action litigation, and intend to prosecute this action vigorously.  The interests of the members of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

  81. **Superiority**.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Furthermore, while the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.

  82. Even if the Class members could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties, is in fact manageable, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.  The benefits of adjudicating this controversy as a class action far outweigh any difficulties that may occur in managing the Class.

  83. In the alternative, the Class may be certified under the provisions of Federal Rules of

Civil Procedure 23(b)(1) and 23(c)(4) because:

   a. The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual Class members and would establish incompatible standards of conduct for Defendants;

   b. The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede the ability of other Class members to protect their interests;

   c. Defendants have acted or refused to act on grounds generally applicable to the Class, making final injunctive relief or corresponding declaratory relief with respect to the members of the Class as a whole an appropriate form of relief; and

   d. The claims of Class members are comprised of common issues that are appropriate for certification under Rule 23(c)(4).

## CLAIM FOR RELIEF

### Violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1
### (Against All Defendants)

84. Plaintiffs hereby incorporate by reference each preceding paragraph as though fully set forth herein.

85. Beginning at time presently unknown to Plaintiffs, but at least as early as January 1, 2000 and continuing through the Class Period, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

86. Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees or representatives while actively engaged in the management of Defendants' affairs.

87. At least as early as January of 2000, and continuing until such time as the anticompetitive effects of Defendants' conduct ceased, the exact dates being unknown to Plaintiffs,

Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to fix, stabilize, and maintain prices for Mesquite Lump Charcoal.

88. In furtherance of the unlawful contract, combination or conspiracy, each of the Defendants and their co-conspirators has committed overt acts, including, *inter alia*:

a. Agreeing to charges prices at certain levels and otherwise to fix, increase, maintain and/or stabilize prices of Mesquite Lump Charcoal sold in the United States;

b. Participating in meetings, conversations and communications with co-conspirators regarding prices to be charged for Mesquite Lump Charcoal;

c. Agreeing to allocate customers;

d. Agreeing not to compete for each other's customers;

e. Refraining from submitting bids for the sale of Mesquite Lump Charcoal to customers allocated to a co-conspirator; and/or

f. Communicating with each other regarding what price to bid for the sale of Mesquite Lump Charcoal and then submitting agreed-upon, noncompetitive bids to each other's customers.

89. The contract, combination or conspiracy alleged herein has had the following effects, among others:

a. Price competition in the sale of Mesquite Lump Charcoal has been restrained, suppressed and/or eliminated;

b. Prices for Mesquite Lump Charcoal sold by Defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels;

c. Plaintiffs and members of the Class have been deprived of the benefits of free and open competition.

90. As a direct and proximate result of Defendants' illegal agreement, contact, combination and/or conspiracy, Plaintiffs and the members of the Class have been injured and damages in their respective businesses and property in an amount to be determined according to proof and are entitled to recover threefold damages sustained pursuant to Section 4 of the Clayton Act, 15

U.S.C. § 15.

91.     The conduct of Defendants and their co-conspirators constitutes a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that:

A.     The Court determines that his action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and enter an order directing that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class, and appointing Plaintiffs as class representatives for the Class and appointing Plaintiffs' counsel as Class Counsel;

B.     The Court adjudge and decree that the acts of the Defendants are illegal and unlawful, including the agreement, contract, combination and/or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have violated Section 1 of the Shearman Act, 15 U.S.C. § 1, and that Judgment be entered against Defendants, jointly and severally, and in favor of Plaintiffs and the Class for damages to the maximum extent allowed under federal antitrust laws,  together with the costs of the action, including reasonable attorneys' fees, and pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

C.     Each of the Defendants, and their respective successors, assigns, parent, subsidiaries, affiliates and transferees, and their officers, directors, agents and representatives, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing or maintaining or renewing the combination, conspiracy, agreement, contract, understanding or concert of action as alleged herein; and

D.     The Court award Plaintiffs and members of the Class such other and further relief as may be necessary and appropriate.

//

//

CLASS ACTION COMPLAINT

1

## DEMAND FOR JURY TRIAL

2      Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a

3  trial by jury on all claims and issues that can be tried to a jury.

4  DATED:  November 7, 2013                    Respectfully submitted,

5                                             **PRITZKER | LAW**

6

7  By:  _____

8       Elizabeth C. Pritzker (SBN: 146267)

9       Bethany L. Caracuzzo (SBN: 190687)
        Shiho Yamamoto (SBN: 264741)

10      633 Battery Street, Suite 110
        San Francisco, CA 94111

11      Telephone:  (415) 692-0772
        Facsimile:  (415) 366-6110

12      Email:  ecp@pritzker-law.com;
                bc@pritzker-law.com;

13              sy@pritzker-law.com

14

15                                             **PEARSON, SIMON & WARSHAW, LLP**

16      Bruce L. Simon (SBN: 96241)
        Robert G. Retana (SBN: 148677)

17      Aaron M. Sheanin (SBN: 214472)
        44 Montgomery Street, Suite 2450

18      San Francisco, CA 94104
        Telephone:  (415) 433-9000

19      Facsimile:  (415) 433-9008
        Email:  bsimon@pswlaw.com;

20              rretana@pswlaw.com;
                asheanin@pswlaw.com

21

22                                             *Attorneys for Plaintiffs and the Proposed Class*

23

24

25

26

27

28