ELIZABETH C. PRITZKER (Bar No. 146267)
  ecp@pritzker-law.com
BETHANY L. CARACUZZO (Bar No. 190687)
  bc@pritzker-law.com
SHIHO YAMAMOTO (Bar No. 264741)
  sy@pritzker-law.com
**PRITZKER | LAW**
633 Battery Street, Suite 110
San Francisco, CA 94111
Telephone: (415) 692-0772
Facsimile: (415) 366-6110

*Plaintiffs' Interim Counsel*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| IL FORNAIO (AMERICA) CORPORATION; OLIVETO PARTNERS, LTD. and THE FAMOUS ENTERPRISE FISH COMPANY OF SANTA MONICA, INC., on behalf of themselves and all others similarly situated, | CASE NO. 3:13-cv-05197 WHA; AND CASE NO. 3:13-cv-05331 WHA (CONSOLIDATED) |
| Plaintiffs, | CLASS ACTION |
| vs. | PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF |
| LAZZARI FUEL COMPANY, LLC, CALIFORNIA CHARCOAL AND FIREWOOD, INC., CHEF'S CHOICE MESQUITE CHARCOAL, RICHARD MORGEN, ROBERT COLBERT, MARVIN RING, and WILLIAM W. LORD, | |
| Defendants. | Date:  September 16, 2014 Time: 10:30 a.m. Courtroom: 8 |
| DARBAR CUISINE, INC., Plaintiff, | Judge:  Hon. William H. Alsup |
| vs. | |
| CHEF'S CHOICE MESQUITE CHARCOAL, LAZZARI FUEL COMPANY, LLC, CALIFORNIA CHARCOAL AND FIREWOOD, INC., and William W. Lord, | |
| Defendants. | |

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................2

II.   STATEMENT OF FACTS .........................................................................4

III.  LEGAL ARGUMENT ................................................................................8

    A.    Legal Standards For Class Certification ..................................................8

    B.    Plaintiffs Satisfy the Requirements of Rule 23(a) ................................10

        1.    The Proposed Class Is Ascertainable and Sufficiently Numerous.............10

        2.    The Case Involves Common Questions of Law and Fact .........................11

        3.    Plaintiffs' Claims Are Typical of the Claims of the Class........................12

            a.    Plaintiffs have standing to assert their Sherman Act claims..........13

            b.    Plaintiffs' claims are typical of other Class Members. ..................14

        4.    Plaintiffs Will Fairly and Adequately Represent The Interests of the Class ................................................................................................17

    C.    The Proposed Class Satisfies Rule 23(b)(3) .........................................19

        1.    Common Questions of Law and Fact Predominate Over Individual Questions.................................................................................20

        2.    Plaintiffs Have Put Forward a Plausible Methodology to Prove Antitrust Impact on a Class-Wide Basis ......................................22

        3.    A Class Action is the Superior to Individual Litigation of Class Members' Claims...............................................................................24

    D.    Interim Counsel Should Be Appointed As Class Counsel.....................24

    E.    Notice to Class Members ......................................................................25

IV.   CONCLUSION.........................................................................................26

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

C<small>ASES</small>

3

4
*Allen v. Wright*,
468 U.S. 737 (1984)........................................................................................13, 18

5
*Alonzo v. Maximus, Inc.*,
275 F.R.D. 513 (C.D. Cal. 2011) ...........................................................................8

6

7
*Amchem Prods. v. Windsor*,
521 U.S. 591 (1997)("*Amchem*")...............................................................9, 19, 20

8

9
*Amgen Inc. v. Conn. Ret. Plans*,
133 S. Ct. 1184 (2013) ("*Amgen*")........................................................................9

10
*Armstrong v. Davis*,
275 F.3d 849 (9th Cir. 2001) ...........................................................................15, 18

11

12
*Arnold v. UA Theatre Circuit, Inc.*,
158 F.R.D. 439 (N.D. Cal. 1994) .........................................................................13

13

14
*Blackie v. Barrack*,
524 F.2d 891 (9th Cir. 1975) ...........................................................................8, 11

15
*Casey v. Lewis*,
4 F.3d 1516 (9th Cir. 1993) ...........................................................................13, 18

16

17
*Cooperweld Corp. v. Indep. Tube Corp.*,
467 U.S. 752 (1984).............................................................................................16

18

19
*Covillo v. Specialty's Cafe*,
2013 U.S. Dist. LEXIS 153724 (Oct. 25, 2013) (Ryu, Magistrate Judge) ............26

20
*Davis v. Astrue*,
250 F.R.D. 476 (N.D. Cal. 2008).........................................................................10

21

22
*DeVoto v. Pacific Fidelity Life Ins. Co.*,
618 F.2d 1340 (9th Cir. 1980) .............................................................................16

23

24
*Eisen v. Carlisle and Jacquelin*,
417 U.S. 156 (1974).............................................................................................26

25
*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) ................................................................................9

26

27
*Gay v. Waiters' & Dairy Lunchmen's Union*,
489 F. Supp. 282 (N.D. Cal. 1980), *aff'd* 694 F.2d 531 (9th Cir. 1982) ...............10

28

*Gen. Tel. Co. of the Southwest v. Falcon,*
   457 U.S. 147 (1982)................................................................................11

*Hanlon v. Chrysler Corp.,*
   150 F.3d 1011 (9th Cir. 1988) .........................................11, 19, 20, 24

*Hanon v. Dataproducts Corp.,*
   976 F.2d 497 (9th Cir. 1992) .............................................................12

*Hawaii v. Standard Oil of Cal.,*
   405 U.S. 251 (1972).............................................................................9

*In re Bulk (Extruded) Graphite Prods. Antitrust Litig,*
   No. Civ. 02-6030, 2006 WL 415066 (D.N.J. Apr. 4, 2006) ..................15

*In re Carbon Black Antitrust Litig.,*
   No. Civ. A.03-10191 (DPW), 2005 WL 102966 (D. Mass. Jan. 18, 2005) .........................23

*In re Catfish Antitrust Litig.,*
   826 F.Supp. 1019 (N.D. Miss. 1993) ..................................................13

*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
   MDL. No. 1917, 2013 U.S. Dist. LEXIS 137945 ................................3

*In re Charles Schwab Corp. Secs. Litig.,*
   2011 U.S. Dist. LEXIS 44547 (Apr. 19, 2011)...................................26

*In re Citric Acid Antitrust Litig.,*
   Case No. 95-1092, 1996 WL 655791 (N.D. Cal. Oct. 2, 1996)...........12, 15, 19, 23

*In re. Citric Acid Antitrust Litig.,*
   No. 95-1092,1996 U.S. Dist. LEXIS 16409 (N.D. Cal. Oct 2, 1996) .................21

*In re Coordinated Pretrial Proc. in Petroleum Prods. Antitrust Litig.,*
   691 F.2d 1335 (9th Cir. 1982) ............................................................9

*In re Corrugated Container Antitrust Litig.,*
   80 F.R.D. 244 (S.D. Tex. 1978)........................................................22

*In re High-Tech Employee Antitrust Litigation,*
   985 F. Supp. 2d 1167 (N.D. Cal. 2013) ............................................21

*In re Magnetic Audiotape Antitrust Litigation,*
   No. 99 CIV. 1580, 2001 WL 619305 (S.D.N.Y. June 6, 2001) ............23

*In re Master Key Antitrust Litig.,*
   528 F.2d 5 (2d Cir. 1975).................................................................17

*In re NASDAQ Market-Makers Antitrust Litig.,*
   172 F.R.D. 119 (S.D.N.Y. 1997) .......................................................12

*In re Pressure Sensitive Labelstock Antitrust Litig.*,
Case No. 3:03-MDL-1566, 2007 WL 4140666 (M.D. Pa. No. 19, 2007) ........................15, 19

*In re Rubber Chemicals Antitrust Litig.*,
232 F.R.D. 346 (N.D. Cal. 2005) .................................................................... passim

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
264 F.R.D. 603 (N.D. Cal. 2009) (N.D. Cal. Sept., 2000) ...................................10, 21, 23, 24

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
Case No. C 07-01819 CW, 2008 WL 4447592 ..............................................................22, 23

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
267 F.R.D. 291 (N.D. Cal. 2010) ..............................................................11, 20, 21

*In re Visa Check/Master Money Antitrust Litig.*,
280 F.3d 124 (2d Cir. 2001).......................................................................21

*In re Visa Check/Mastermoney Antitrust Litig.*,
192 F.R.D. 68 (E.D.N.Y. 2000) ...................................................................23

Mem.*, U.S. v. William W. Lord*,
12-cr-00326-WHA ...............................................................................3

*O'Connor v. Boeing N. Am. Inc.*,
184 F.R.D. 311 (C.D. Cal. 1998) .................................................................10

*Reiter v. Sonotone Corp.*,
442 U.S. 330 (1979)............................................................................9, 22

*U.S. v. William W. Lord*,
12-cr-00326-WHA ...............................................................................3, 5

*Wal-Mart Stores, Inc. v. Dukes, et al.*,
131 S. Ct. 2541 (2011) .........................................................................9, 20

*Wehner v. Syntex Corp.*,
117 F.R.D. 641 (N.D. Cal. 1987) .................................................................13

**STATUTES**

Clayton Act, 15 U.S.C. §§ 15 and 26........................................................................4

Fed. R. Civ. P. 23 .................................................................................. passim

Fed. R. Civ. P. 30(b)(6).......................................................................19

Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 and Sections 4 and 16 .................... passim

1

**OTHER AUTHORITIES**

2

4 Conte, *Newberg on Class Actions,* §11.53......................................................................25

3

5 James W. Moore, *Moore's Federal Practice*, § 23.21[1]..........................................10

4

Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil Procedure* § 1781 at 254-55 (3d ed. 2004)....................................24

5

6

http://www.fjc.gov .......................................................................................................25

7

Article III of the U.S. Constitution ........................................................................13, 18

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; MEMO. OF PTS. AND AUTHS. IN SUPPORT

1

## NOTICE OF MOTION AND MOTION

2 TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

3          PLEASE TAKE NOTICE that on September 16, 2014, at 10:30 a.m., or as soon thereafter

4 as the matter can be heard, in the Courtroom of the above-entitled Court of the United States District

5 Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco,

6 California, 94102, Plaintiffs Il Fornaio (America) Corporation, Oliveto Partners, Ltd., and The Famous

7 Enterprise Fish Company of Santa Monica, ("plaintiffs") will and hereby do move the Court, pursuant

8 to Federal Rule of Civil Procedure 23 ("Rule 23"), for an Order certifying a plaintiff class (the "Class")

9 defined as follows:

10              All persons in the United States who purchased Mesquite Lump Charcoal directly
11              from any Defendant, and/or their subsidiaries and co-conspirators, during the period
                from and including January 2000 through at least September 30, 2011 (the 'Class
12              Period').  Excluded from the class are Defendants and their co-conspirators; any
                entity in which Defendants have or had a controlling interest; Defendants' officers,
13              directors, and employees; members of Defendants' immediate families and legal
                representatives, successors, and assigns; and any judge assigned to this matter,
14              together with his or her immediate family members.

15          Plaintiffs will also move the Court to appoint them as Class Representatives, to appoint Elizabeth

16 C. Pritzker and the law firm of Pritzker Law as Class Counsel, and to approve a form of class notice and

17 dissemination of that notice to the Class via mail.

18          This motion is based upon this Notice of Motion and Motion and Memorandum of Points

19 and Authorities, the declaration of Elizabeth C. Pritzker (hereinafter "Pritzker Decl."), the Expert

20 Declaration of Andrew D. Schwarz of OSKR, LLC (hereinafter "Schwarz Decl."), all exhibits and

21 appendices to such documents, the pleadings and other documents on file in this case, and any

22 argument that may be presented to the Court.

23
## STATEMENT OF ISSUES TO BE DECIDED

24      1.  Whether this action should be certified as a class action pursuant to Rule23;

25      2.  Whether the Court should appoint plaintiffs as Class Representatives;

26      3.  Whether the Court should appoint Interim Counsel as Class Counsel.

27      4.  Whether notice should be sent to Class Members.

28

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

This Sherman Act case is ideally suited for prosecution of a class action.  Defendants Lazzari Fuel Company, LLC ("Lazzari'), California Charcoal and Firewood, Inc. ("California Charcoal"), and Chef's Choice Mesquite Charcoal ("Chef's Choice") (collectively, "defendants") are all located in California, and are long-term importers, distributors and sellers of Mesquite Lump Charcoal across the United States.  Mesquite Lump Charcoal is harvested in Mexico and packaged, marketed and sold in the United States for restaurant or food service use in grilling meats, poultry and fish.[1]

Plaintiffs allege that, during the period January 1, 2000 through September 31, 2011, defendants engaged in a conspiracy to allocate Mesquite Lump Charcoal customers and to not compete for sales of Mesquite Lump Charcoal.  Plaintiffs allege, and defendants' documents and testimony confirm, that defendants carried out the conspiracy by, among other things:

1.  Agreeing not to complete for sales of mesquite charcoal to co-conspirators' customers;

2.  Refraining from submitting bids for the sale of Mesquite Lump Charcoal to customers allocated to co-conspirators; and/or

3.  Communicating regarding bids prices and then submitting agreed-upon and intentionally non-competitive bids to co-conspirators' customers.

The purpose and effect of this conspiracy, as admitted by two of the three defendants, was to raise, stabilize or fix the price of Mesquite Lump Charcoal.  Plaintiffs allege that defendants' conspiracy affected all direct purchasers of Mesquite Lump Charcoal because the prices they paid were higher than what they would have been absent the conspiracy.

The law in this Circuit favors class treatment of *per se* antitrust actions, such as this one, that arise from a joint course of anticompetitive conduct, causing harm to all members of the Class. The "Courts have stressed that price-fixing cases are appropriate for class certification because a class-action lawsuit is the most fair and efficient means of enforcing the law where antitrust violations have been continuous, widespread, and detrimental to as yet unidentified consumers." *In*

---

[1] *See* First Am. Cmplt. [Dkt. 75], ¶ 4.

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; MEMO. OF PTS. AND AUTHS. IN SUPPORT

1  *re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL. No. 1917, 2013 U.S. Dist. LEXIS 137945, *83

2  (N.D.Cal. June 20, 2013), citing *In re TFT-LCD (Flat Panel) Antitrust Litigation (LCDs)*, 267 F.R.D.

3  583, 592 (N.D. Cal. 2010), *amended in part*, (N.D. Cal. July 28, 2011) (internal citations omitted).)

4  For certification requirements, as shown below, plaintiffs satisfy the requirements of Rule 23(a):

5  numerosity, commonality, typicality, and adequacy.  Plaintiffs also meet the requirements of Rule

6  23(b)(3):  predominance and superiority.  The elements of plaintiffs' claims—the existence of the

7  conspiracy, its impact on the Class, and the resulting damages—arise from a single course of conduct

8  and will be established through common proof.  Therefore, common issues predominate.

9        Importantly, the existence of the conspiracy alleged in plaintiffs' complaint is not open to

10  dispute.  Defendant William W. Lord, the owner of Chef's Choice, previously admitted and pled

11  guilty to the very conspiracy alleged in the complaint before this Court and went to federal prison

12  as a result. (*See* Defendant's Sentencing Mem*., U.S. v. William W. Lord*, 12-cr-00326-WHA [Dkt.

13  14].)  In doing so, Lord admitted that he and his co-conspirators, defendants Robert Colbert and

14  Richard Morgen of Lazzari, and defendant Marvin Ring of California Charcoal, engaged in a *per se*

15  antitrust conspiracy that harmed thousands of direct purchasers of Mesquite Lump Charcoal, the

16  members of this Class.[2]  A class action is therefore the best mechanism to ensure that restitution is

17  paid to those who paid overcharges as a result of the defendants' conspiracy and to deter future

18  misconduct.

19        Lazzari, the amnesty applicant here, also is guilty of forming and acting in furtherance of the

20  alleged conspiracy, and has agreed to settle this case and cooperate with plaintiffs in the prosecution

21  of this case against non-settling defendants.  Accordingly, Lazzari does not contest or oppose this

22  motion for class certification.  To the extent that remaining, non-settling defendants dispute the

23  existence or scope of the conspiracy, however, plaintiffs' liability proof will be identical for each

24  ───────────────

25  [2] *See* Transcript of Deposition of William W. Lord ["Lord Dep."], Exh C (Defendants' Sentencing Memorandum, *U.S. v. William W. Lord*, 12-cr-00326-WHA [Dkt. 14] at 5:17-6:2;  Exh. E (Sept.

26  24, 2012 Sentencing Transcript, *U.S. v. William W. Lord* [Dkt. 14] at 16:12-18 [Judge William H. Alsup to Defendant William W. Lord: "These conspiratorial agreements steal money out of the

27  economy just like somebody who goes into a bank with a gun. They've been illegal for more than a century. ***It's a per se violation to do what you did***; ***it is a despicable crime against the economy***

28  ***of this country***."] (bold italics added).)

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; MEMO. OF PTS. AND AUTHS. IN SUPPORT

Class Member.  Additionally, as explained below, and in his declaration, plaintiffs' expert, Andrew D. Schwarz, shows how class-wide impact and class damages can be established utilizing a structural model that fits the allegations and circumstances of this case, and which uses actual sales, and financial and pricing data provided by defendants.

Because of these overwhelming common issues, trying this case as a class action is superior to a series of separate trials, which would waste resources and risk inconsistent results.  Thus, the Court should certify the proposed Class, appoint the plaintiffs as Class Representatives, and appoint Interim Counsel for the Class as Class Counsel.

## II.   STATEMENT OF FACTS

This action involves an eleven-year agreement, understanding or conspiracy among and between the defendants to allocate customers and not compete for sales of mesquite charcoal to each other's customers.  Mesquite Lump Charcoal is harvested in Mexico, and is primarily used in the restaurant industry for grilling meats, poultry and fish.  Defendants are all located in California and are long-term importers, distributors and sellers of Mesquite Lump Charcoal across the United States.

Plaintiffs are restaurants that purchased Mesquite Lump Charcoal directly from defendants during the alleged 11-year conspiracy.  Plaintiffs assert a claim under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.  Plaintiffs seek damages and appropriate injunctive relief for themselves and a proposed class of persons that purchased Mesquite Lump Charcoal directly from defendants for restaurant or food service, as defined in the First Amended Complaint.

One of the defendants, William Lord, pleaded guilty to criminal antitrust charges and admitted that "[f]rom 2000 to 2011," he and his company, Chef's Choice, "participated in an arrangement with two competitors, Lazzari Fuel Company, [LLC] and California Charcoal and Firewood, [Inc.,] wherein each of the three companies and their principals agreed to suppress and restrain competition by:

1.   Agreeing not to complete for sales of mesquite charcoal to co-conspirators' customers;

2.  Refraining from submitting bids for the sale of Mesquite Lump Charcoal to customers allocated to  co-conspirators; and/or

3.  Communicating regarding bids prices and then submitting agreed-upon and intentionally non-competitive bids to co-conspirators' customers."

(*See* Defendant's Sentencing Mem., *U.S. v. William W. Lord*, 12-cr-00326-WHA [Dkt. No. 14]; Pritzker Decl., Exh. C.)  Mr. Lord testified that, in his Plea Agreement, which he signed voluntarily and with the benefit of counsel, Lord admitted to a conspiracy with entities identified as Company A and Company B, led by individuals A, B, and C.  In his deposition, Lord identified the companies listed in the Plea Agreement to be "California Charcoal" and "Lazzari Fuel," and the individuals to be "Marvin Ring, Richard Morgen and Robert Colbert." (Lord Dep. at 57:18-58:17, Pritzker Decl., Exh. C).[3]

In entering his Guilty Plea, Lord admitted the factual basis for the criminal charges against him:

> Beginning as early as January 2000 and continuing until in or about September 2010, Defendant LORD ***and co-conspirators*** entered into and engaged in a combination and conspiracy to suppress and restrain competition by agreeing not to compete for competitors' customers, including sales of mesquite charcoal in the Northern District of California, and by submitting noncompetitive bids for the sale of mesquite charcoal in the United States...

(Lord Dep. at 36:13-37:8; Pritzker Decl., Exh. C) (bold italics added).

Lord also provided testimony with respect to a portion of his Plea Agreement that indicates the agreement among the defendants not to compete for each other's customers was implemented on several occasions, including:

> A 2004 conversation where Mr. Lord spoke with Mr. Ring [the owner of California Charcoal] about having problems getting mesquite charcoal. During that conversation, Mr. Lord told Mr. Ring that he was planning to bid for a customer in Brea, California, but that Mr. Ring told Mr. Lord that the Brea entity was a customer of California Charcoal.  Mr. Lord understood that, "per their agreement, [Mr. Ring] was signaling to him to him that Defendant should not submit a bid to that customer."   Mr. Lord complied and did not bid to that

---

[3] None of the parties identified by Mr. Lord in his criminal allocution contested the factual basis for Mr. Lord's guilty plea, including his statements regarding the nature, scope and length of the conspiracy, and each party's role and acts in furtherance of the conspiracy.  (*See* Lord Dep., 33:3-20; 41:11-16.)

customer.

(Lord Dep., 58:18-61:7, Pritzker Decl., Exh. C). At deposition, Lord identified the "customer in Brea, California" referenced in his Plea Agreement as "Sysco-Los Angeles." Lord admitted that the facts related in the Plea Agreement were accurate and testified that, in fact, "per their agreement," Lord did not submit a bid to Sysco-Los Angeles for the sale of mesquite charcoal.  (*Id.* at 59:25-60:11.)

Additionally, Lord testified that he understood that certain telephone calls between Lord and Richard Morgen, and at least one telephone call between Lord and a former Lazzari employee, Mark Schulz, had been recorded, *sub rosa*, by the FBI.  (Lord Dep. at 30:14-20, 114:7-14, Pritzker Decl., Exh. C)  In one such recorded call with Mr. Schulz, Lord is quite plain about the nature of the parties' conspiracy, the identities of his co-conspirators, and the conspiracy's intended purpose to "keep the price up" for mesquite lump charcoal:

> ....I've called [Richard Morgen] before or [Robert Colbert] before, or [Marvin Ring] before, and uh, we all have just kinda let everything along throughout the years. Um, I know where his customers are, he's knows [sic] where mine are, but for some reason, just a phone call or "what should we, what should I quote so that it will, you know, make you look okay." Like that. That's pretty much been the conversation through the years. Because, ahhh, all of us have raised our prices before and what happens is the com-, the company calls and says they can get it at a better price. And so we've always, uh, kept each other's backs in a sense. I mean that's just...that's what we..."
>
> * * *
>
> ...So, we have been in...me and [Lazzari] and [Marvin Ring] have kept the price up and not let that happen if it makes sense."

(Lord Dep., Exh. 66 at 8:12-30, 23:22-24.)   Defendants Richard Morgen and Robert Colbert also gave testimony about the nature and scope of the defendants' conspiracy.  Morgen testified that he, Colbert and Lord met at the Oakland Airport in the late 1990's and entered into an agreement to notify each other whenever an existing customer of the other was "shopping around for prices" for mesquite charcoal. Pritzker Decl., ¶ 14, Exh. E.  Under this "mutual arrangement," if Lazzari received a request for a price quote for mesquite charcoal from a Chef's Choice customer, Lazzari would call and ask Lord what Lazzari should bid to ensure that Chef's Choice "was the low bidder" and would retain the customer's mesquite charcoal business.  Alternatively, it was agreed that the

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; MEMO. OF PTS. AND AUTHS. IN SUPPORT

1  entity contacted for the quote would either not provide a quote or offer a pre-textual reason for not

2  selling to the customer – for example, by providing misleading information about its inventory or

3  current supply of mesquite charcoal. *Id*. Colbert corroborated Morgen's testimony about an

4  agreement that "Lazzari and Bill Lord would not actively or in any way take an existing customer

5  away from the other." *Id*., Exh. F, 128:2-24.

6  While Morgen and Colbert denied entering into an *express* agreement with defendant Ring

7  of California Charcoal not to compete, both men admitted that Lazzari decided not to compete, and

8  in fact, did not compete with California Charcoal and/or Ring during the relevant 11-year period.

9  Pritzker Decl., ¶ 15 Exhs. E, F.  Contemporaneous notes taken by Colbert and Morgen evidence

10  frequent communications between Lazzari and Ring, and corroborate Lord's prior admissions

11  regarding an unlawful conspiracy among Lazzari, Chef's Choice and California Charcoal, and their

12  principals, to allocate and refrain from competing for each other's customers.  *Ibid.*

13  Morgen and Colbert took contemporaneous notes of phone calls between themselves and

14  William Lord and Marvin Ring. (Morgen Dep. at 178:9-12, Pritzker Decl, Exh. E) A conservative

15  count of these notes, which were produced in discovery, shows that Lazzari and Ring spoke on the

16  phone on at least **60** occasions between 2000 and 2010.  Lazzari and Lord spoke on at least **40**

17  occasions during this time period. These notes detail conversations where Morgen, Colbert, Lord

18  and Ring: (1) agreed not quote one of the other entity's customers; (2) agreed to quote another's

19  entity's customer at a price higher than the current account-holder so as not to "poach" the account

20  from the existing account-holder; or (3) agreed to give another entity's customer an inaccurate, pre-

21  textual reason for not providing a price quote. (Morgen Dep., Exhs. 9, 10, 11, 13, 18; Lord Dep.,

22  Exhs. 70 and 72, Pritzker Decl, Exhs. E and C, respectively.)

23  The notes also detail calls where the three defendants—Lazzari, California Charcoal and

24  Chef's Choice—frequently exchanged proprietary cost and supplier information; revealed the

25  identities of their respective customers; sold each other mesquite lump charcoal at favorable prices

26  not available to their non-conspiratorial competitors; discussed the prices defendants were charging

27  to existing customers; and/or provided advance information about anticipated or proposed price

28  increases for mesquite lump charcoal. (*See* Morgen Dep., Exhs. 13 [LAZZ00142], 15, 16, 17, 20;

Ring Dep., Exhs. 49, 50, 51, 54, 55, 56, Lord Dep., Exhs. 70, 71, 72; LAZZ-00005; Pritzker Decl.,

Exhs. E, L and C, respectively.)

### III.   LEGAL ARGUMENT

    **A.**    **Legal Standards For Class Certification**

        To be certified as a class action, this case must satisfy the four requirements of Rule 23(a)

and two requirements of Rule 23(b)(3).  Under Rule 23(a), certification is appropriate if:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Rule 23(b)(3) provides that a class may be certified if:

> the court finds that common questions of law and fact predominate over individualized inquiries, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

        The Ninth Circuit has set out the following standard that applies to a motion for class

certification:

> The court is bound to take the substantive allegations of the complaint as true, thus necessarily making the class order speculative in the sense that the plaintiff may be altogether unable to prove his allegations. While the court may not put the plaintiff to preliminary proof of his claim, it does require sufficient information to form a reasonable judgment. Lacking that, the court may request the parties to supplement the pleadings with sufficient material to allow an informed judgment on each of the Rule's requirements.

*Blackie v. Barrack*, 524 F.2d 891, 901, n. 17 (9th Cir. 1975).

        In certifying a class, a "court may consider evidence that may not be admissible at trial."

*Alonzo v. Maximus, Inc.*, 275 F.R.D. 513, 519 (C.D. Cal. 2011) (internal quotation marks omitted);

*In re Coordinated Pretrial Proc. in Petroleum Prods. Antitrust Litig.*, 691 F.2d 1335, 1342 (9th Cir.

1982) "[I]n determining whether to certify the class, the district court is bound to take the substantive

allegations of the complaint as true . . . ."  *In re Coordinated Pretrial Proc. in Petroleum Prods.*

*Antitrust Litig.*, 691 F.2d 1335, 1342 (9th Cir. 1982).

"However, Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc."  *Wal-Mart Stores, Inc. v. Dukes, et al.*, 131 S. Ct. 2541, 2551 (2011).  In determining whether plaintiffs have satisfied their burden under Rules 23(a) and (b), the Court must conduct a "rigorous analysis," which may require it to probe behind the pleadings to resolve the class certification question. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 980–81 (9th Cir. 2011).  This "rigorous analysis" can entail consideration of supplementary material beyond the complaint, as plaintiffs have submitted here.  It can also overlap with issues relating to the merits. *Id.*  The merits may be considered if necessary to determine if the requirements of Rule 23 are met. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551–52 & n.6 (2011) ("*Wal-Mart*").   However:

> Although we have cautioned that a court's class-certification analysis must be "rigorous" and may "entail some overlap with the merits of plaintiff's underlying claim," *Wal-Mart*, 131 S. Ct. 2541 (2011) (internal quotation marks omitted), Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether Rule 23 prerequisites for class certification are satisfied. *See id.* at 2552, n.6 (a district court has no "'authority to conduct a preliminary inquiry into the merits of a suit'" at class certification unless it is necessary "to determine the propriety of certification.").

*Amgen Inc. v. Conn. Ret. Plans*, 133 S. Ct. 1184, 1194-95 (2013) ("*Amgen*"). *See also Ellis*, 657 F.3d at 983 n.8.

The Supreme Court has long recognized that antitrust class actions like this one are a vital component of antitrust enforcement.  *See generally Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997)("*Amchem*"); *Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979); *Hawaii v. Standard Oil of Cal.*, 405 U.S. 251, 266 (1972).   Class actions play an important role in the private enforcement of antitrust actions.  For this reason courts resolve doubts in these actions in favor of certifying the class." *In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. 346, 350 (N.D. Cal. 2005) ("*Rubber Chems.*"); *see also SRAM*, 2008 U.S. Dist. LEXIS 107523, at *37 (N.D. Cal. September 29, 2008) (citation omitted). "Courts have stressed that price-fixing cases are appropriate for class certification because 'a class-action lawsuit is the most fair and efficient means of enforcing the law where antitrust violations have been continuous, widespread, and detrimental to as yet unidentified

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; MEMO. OF PTS. AND AUTHS. IN SUPPORT

consumers.'"  *Rubber Chems.*, 232 F.R.D. at 351 (citation omitted).

### B.    Plaintiffs Satisfy the Requirements of Rule 23(a)

#### 1.    The Proposed Class Is Ascertainable and Sufficiently Numerous

The first requirement under Rule 23(a) is that the class is so numerous that joinder of all members would be "impracticable" yet the class must be ascertainable. *See Gay v. Waiters' & Dairy Lunchmen's Union*, 489 F. Supp. 282 (N.D. Cal. 1980), *aff'd* 694 F.2d 531 (9th Cir. 1982). To satisfy this requirement, "plaintiffs need not state the 'exact' number of potential class members, nor is there any specific magic number that is required."  *DRAM*, 2006 WL 1530166, at *3 (citing *Rubber Chems.*, 232 F.R.D. at 350-51).  Courts routinely hold that the numerosity requirement is satisfied when the class comprises 40 or more members.  *See Davis v. Astrue*, 250 F.R.D. 476, 485 (N.D. Cal. 2008) ("As a general rule, classes numbering greater than 41 individuals satisfy the numerosity requirement.").  Here, based upon the records of the defendants, plaintiffs' Interim Counsel estimates that the Class consists of roughly 1,500 direct purchasers of Mesquite Lump Charcoal. (Pritzker Decl., ¶ 18).  That is more than sufficient to satisfy numerosity.  Moreover, these purchasers are ascertainable based upon the objective criteria of whether they purchased Mesquite Lump Charcoal from defendants during the relevant period, the large majority of which are identifiable from defendants' own customer lists, which two of the three defendants have produced to plaintiffs and are being vetted by Interim Counsel. *Id.*

A class definition is sufficient if the class description is "definite enough so that it is administratively feasible for the court to ascertain whether an individual is a member." *O'Connor v. Boeing N. Am. Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998).  "The identity of class members must be ascertainable by reference to objective criteria." 5 James W. Moore, *Moore's Federal Practice*, § 23.21[1].  Here, the proposed class definition is objective and ascertainable.  The Class is defined in terms of discrete transactional facts, *i.e.*, direct purchaser of Mesquite Lump Charcoal from any defendant and/or their subsidiaries and co-conspirators and affiliates during the period January 2000 through September 30, 2011.  These are objective criteria for determining whether a person or entity falls within the Class.  Whether a Class member bought Mesquite Lump Charcoal during the Class

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; MEMO. OF PTS. AND AUTHS. IN SUPPORT

1  Period is determinable by records of the defendants and the receipts and records of Class members.

2  Thus, the proposed Class is both sufficiently numerous and ascertainable.

3            **2.      The Case Involves Common Questions of Law and Fact**

4        The commonality requirement is met if there are questions of law and fact common to the

5  class.  Fed. R. Civ. P. 23(a)(2); *see Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1988).

6  Not all questions of fact and law need be common to satisfy this rule.  *Id.*  "The commonality and

7  typicality requirements of Rule 23(a) tend to merge.  Both serve as guideposts for determining

8  whether under the particular circumstances maintenance of a class action is economical and whether

9  the named plaintiff's claim and the class claims are so interrelated that the interests of the class

10  members will be fairly and adequately protected in their absence." *Gen. Tel. Co. of the Southwest v.*

11  *Falcon*, 457 U.S. 147, 158, n. 13 (1982). Rather, "Rule 23(a)(2) has been construed permissively.

12  All questions of fact and law need not be common to satisfy the rule. The existence of shared legal

13  issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled

14  with disparate legal remedies within the class." *Hanlon*, 150 F.3d at 1019; *see also Blackie v.*

15  *Barrack*, 524 F.2d 891, 902 (9th Cir. 1975) (commonality not defeated by "[s]light differences in

16  class members' positions.")

17        Courts have consistently held that "the very nature of a conspiracy antitrust action compels

18  a finding that common questions of law and fact exist." *DRAM*, 2006 WL 1530166, at *3, *Rubber*

19  *Chems.*, 232 F.R.D. at 351.  This is because the proof of the existence, scope, effectiveness, and

20  implementation of a conspiracy to manipulate prices is identical for each class member.  *DRAM*,

21  2006 WL 1530166, at *4.  Moreover, in antitrust cases, proof of an alleged conspiracy will focus on

22  defendants' conduct and not on the conduct of individual class members."  *In re TFT-LCD (Flat*

23  *Panel) Antitrust Litig.*, 267 F.R.D. 291, 310 (N.D. Cal. 2010).  Here, all Class Members purchased

24  the *exact same product* from defendants, Mesquite Lump Charcoal, the only difference being some

25  Class members bought it in 20 lb. bags and some bought it in 40 lb. bags.

26        Moreover, the central issues in this matter are:

27

28

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; MEMO. OF PTS. AND AUTHS. IN SUPPORT

(1)    whether defendants engages in a contract, combination or conspiracy to fix, maintain or stabilize the prices of, or allocate the market for, Mesquite Lump Charcoal distributed and sold in the United States;

(2)    whether the agreement contract, combination or conspiracy violated Section 1 of the Sherman Act;

(3)    whether defendants' conduct caused plaintiffs and the Class Members to pay more for Mesquite Lump Charcoal than they otherwise would have paid in an unrestrained, competitive market; and

(4)    whether plaintiffs and Class Members were injured by defendants' conduct and, if so, the  appropriate class wide measure of damages.

First Amended Complaint, ¶ 82.

These same questions have been routinely found to satisfy the commonality requirement in other antitrust class actions.  *See*, *e.g.*, *DRAM,* 2006 WL 1530166 at *3-4; *Rubber Chems.*, 232 F.R.D. at 351; *Citric Acid*, 1996 WL 655791 at *3.  The questions all revolve around the existence, scope, effectiveness and implementation of defendants' conspiracy, and are central to plaintiffs' and each Class Members' claims.  The issues raised by defendants' affirmative defenses—including any purported defenses based on market definition—also common to the Class. *See In re NASDAQ Market-Makers Antitrust Litig.*, 172 F.R.D. 119, 123 (S.D.N.Y. 1997).  Thus, plaintiffs satisfy the commonality requirement of Rule 23(a)(2).

### 3.    Plaintiffs' Claims Are Typical of the Claims of the Class

Rule 23(a)(3) requires that the claims or defenses of the representative parties are typical of the claims or defenses of the class. "The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992); *DRAM*, 2006 WL 1530166 at *4 (a plaintiffs' claims are typical when they arise from the same event, practice or course of conduct that gives rise to the claims of absent class members, and if their claims are based on the same legal or remedial theory as class members' claims).

As with commonality, typicality is easily satisfied in price-fixing cases because "in instances wherein it is alleged that the defendants engaged in a common scheme relative to all members of the class, there is a strong assumption that the claims of the representative parties will be typical of the absent class members." *In re Catfish Antitrust Litig.*, 826 F.Supp. 1019, 1035 (N.D. Miss. 1993); *see also DRAM*, *supra*, at *4-6, *Arnold v. UA Theatre Circuit, Inc.*, 158 F.R.D. 439, 449 (N.D. Cal. 1994); *Wehner v. Syntex Corp.*, 117 F.R.D. 641, 644 (N.D. Cal. 1987) ("If a court determines that a plaintiff's claim is typical of the class, then by implication, the court has necessarily determined that common questions exist. The converse is also true.")

Here, each plaintiff has standing to assert the antitrust claims alleged in the First Amended Complaint and is motivated to act on behalf of the proposed plaintiff Class. Plaintiffs' claims also are typical of the other direct purchaser Class Members.

### a.    Plaintiffs have standing to assert their Sherman Act claims.

Article III of the U.S. Constitution "requires a litigant to have 'standing' to invoke the power of a federal court." *Allen v. Wright*, 468 U.S. 737, 750 (1984). To have standing, a "plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Id.* at 751. "At least one named plaintiff must satisfy the actual injury component of standing in order to seek relief on behalf of himself or the class." *Casey v. Lewis*, 4 F.3d 1516, 1519 (9th Cir. 1993).

Plaintiffs have alleged and can show they satisfy the actual injury component of standing, here. Each plaintiff is a restaurant that directly purchased Mesquite Lump Charcoal from one or more of the defendants during the alleged Class Period. *See* First Amend. Cmplt. [Dkt. 55], ¶¶ 7, 12, 13, 14. Thus, like all proposed Settlement Class members, plaintiffs can allege and will seek to demonstrate, through a damages expert, that they overpaid due to the conspiracy among defendants and were injured by that overcharge. *See* Schwarz Decl., ¶¶ 8, 55-88.

Plaintiffs are motivated to act, have acted, will continue to act on behalf of the unnamed members of the proposed Settlement Class. As shown in discovery produced in the litigation, each plaintiff purchased significant amounts of Mesquite Lump Charcoal during the alleged Class Period. Enterprise Fish purchased approximately $152,760 worth of Mesquite Lump Charcoal during the

period directly from two defendants, California Charcoal and Chef's Choice. Pritzker Decl., ¶ 20. Oliveto purchased approximately $54,458 worth of Mesquite Lump Charcoal during the Class Period directly from Lazzari. *Id.*; *see also* Exh. K, ¶ 11. Also during the Class Period, Il Fornaio purchased approximately $1,740,756 worth of Mesquite Lump Charcoal directly from California Charcoal and Lazzari. *Id.*   Indeed, according to discovery produced in the litigation, defendant Lazzari (who does not context class certification here) at one time considered Il Fornaio to be one of its top five Mesquite Lump Charcoal customers. *Id.*   The significance of plaintiffs' Mesquite Lump Charcoal purchases, alone, suggests that each plaintiff is motivated to prosecute the litigation, both for itself and the proposed Class.

### b.    Plaintiffs' claims are typical of other Class Members.

Plaintiffs also satisfy the requirement of typicality.  Here, Plaintiffs assert a single cause of action on behalf of themselves and the proposed direct purchaser plaintiff Class. (*See* Dkt. 75 (Am. Comp., ¶¶ 88-95).)  Defendants' alleged collusion and conspiracy to not compete for customers and to not underbid one another's existing customers—which is admitted, here, by two of the three defendants—is the basis for the claims of each plaintiff and each and every Class Member who purchased Mesquite Lump Charcoal directly from defendants.  Therefore, plaintiffs' claims are typical of the other Class Members.

The Court should reject out of hand any argument that depends on purported factual differences among the Class Members' individual transactions.  For class certification purposes, the typicality inquiry focuses on the conduct of the defendants, not on the individual transactions with plaintiffs. *DRAM*, 2006 WL 1530166 at *5.  In *DRAM*, the court rejected the defendants' arguments that plaintiffs' claims were not typical because there were different types of DRAM purchased, different categories of customers that purchased DRAM, and different sales channels through which customers bought DRAM.  The plaintiffs' claims were typical, the court found, because they all arose from allegations of purchases of products at prices artificially inflated by the anticompetitive conspiracy. *Id.* at **4-6.  "Typicality is usually satisfied in a horizontal antitrust conspiracy case, even though a plaintiff may have purchased from one defendant but not another." *In re Pressure Sensitive Labelstock Antitrust Litig.*, Case No. 3:03-MDL-1566, 2007 WL 4140666, at *10 (M.D.

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; MEMO. OF PTS. AND AUTHS. IN SUPPORT

Pa. Nov. 19, 2007).  Even "pronounced factual differences" will "generally not" preclude a finding of typicality so long as "there is a strong similarity of legal theories."  *In re Bulk (Extruded) Graphite Prods. Antitrust Litig*, No. Civ. 02-6030, 2006 WL 415066 at \*5 (D.N.J. Apr. 4, 2006) (certifying class; named plaintiffs represented only one customer category of three, but prices in all categories were allegedly inflated by the same price fixing conspiracy) (quoting *Baley Neal v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994)).

These authorities make clear that plaintiffs may assert claims that are "typical" of other Class members even though individual plaintiffs or Class members suffered less (or more), or suffered injuries at different times, or purchased through different sales or delivery channels.  *Armstrong v. Davis*, 275 F.3d 849, 869 (9th Cir. 2001).  Indeed, typicality is easily generally satisfied in Section 1 cases because "in instances wherein it is alleged that the defendants engaged in a common scheme relative to all members of the class, there is a strong presumption that the claims of the representative parties will be typical of the absent class members."  *In re Citric Acid Antitrust Litig*., Case No. 95-1092, 1996 WL 655791, at \*3 (N.D. Cal. Oct. 2, 1996).

Although two of the defendants—Lord/Chef's Choice and Lazzari—have admitted to the very conspiracy alleged here, and while Lazzari does not oppose certification of the proposed plaintiff Class, plaintiffs anticipate that Chef's Choice and California Charcoal may argue that plaintiffs cannot allege a proper geographic market for class certification purposes because, these defendants theorize, Mesquite Lump Charcoal is a heavy bulk product that requires shipping and defendants employ different shipment methods.  *See* Cal. Charcoal Answer [Dkt. 80], ¶ 98; Chef's Choice Answer [Dkt. 83], ¶ 98.  These defendants take the position that the defendants operated in geographically discernible local markets (Los Angeles, the San Francisco Bay Area, and Santa Barbara); that the Mesquite Lump Charcoal market is divided into separate, disaggregated markets for wholesale full- and half-truckload deliveries that were not used for the Mesquite Lump Charcoal that plaintiffs purchased; and that defendants alleged collusion did not have any effect on competition in the regional markets in which plaintiffs purchased less-than-full- or half-truckloads of product.  Defendants' assertions do not defeat class certification, for each of several reasons.

First, plaintiffs here allege *per se* violations of the Sherman Antitrust Act involving

customer allocation and agreements not to compete for each other's customers.  *See* First Amend. Cmplt. ¶ 85-91; Pritzker Decl., Exh. D [Sept. 24, 2012 Sentencing Transcr. Of William W. Lord] at 16:12-18 (Judge Alsup to Defendant Lord:  "These conspiratorial agreements steal money out of the economy just like somebody who goes to the bank with a gun.  They've been illegal for more than a century.  It's a *per se* violation to do what you did; it's a despicable crime against the economy of this country.").  Under the *per se* standard, plaintiffs are relieved of the obligation to define a market and prove market power.  *See Cooperweld Corp. v. Indep. Tube Corp*., 467 U.S. 752, 768 (1984); *DeVoto v. Pacific Fidelity Life Ins. Co*., 618 F.2d 1340, 1345 (9th Cir. 1980) (absent a *per se* violation, competitive injuries must be defined in terms of a discrete market).

Second, it is simply not factually the case that defendants operated in geographically distinct markets, or in specialized markets defined by methods of shipment, during the Class Period.  Records produced by California Charcoal in discovery show hundreds of transactions with "ship to" addresses in Northern California, Santa Barbara, and Central Valley regions during the Class Period (excluding inter-defendant transactions). Schwarz Decl., ¶ 35.  Lazzari's records include 131 transactions sold to customers with "ship to" addresses in Southern California over four years in 2008-2011. *Id*.  Defendants had the ability to sell, and did sell, Mesquite Lump Charcoal into each other's regions, sometimes functioning as the retail arm for one another, so that a defendant could sell mesquite lump charcoal to an allocated customer using that defendant's preferred delivery method without competition from another defendant. *Id*, ¶¶ 36-39.  The transactional data is especially illuminating given the allegations in this case.  If, as Chef's Choice and California Charcoal contend, there was no way to effectively compete in each other's geographic markets, or if the full- and half-truckload market was a distinct market, why would defendants need to agree not to compete or undercut each other in quoting to each other's customers—as at least of the four of individual co-conspirator defendants have admitted to have done here—if the actual price that would have been quoted would have been higher than the defendant's price in the local area?  *See* Pritzker Decl., Exh. C [Lord Dep. at 36:12-37:12, 38:13-40:1, 51:12-53:2, 53:3-58:4.]; Exh. E [Morgen Dep. at 102:3-18, 102:21-103:14, 104:15-22, 107:15-108:14, 111:19-112:4, 138:9-14, 189:20-190:24, Exh. 10; 191:16-25, 193:13-18, Exh. 11; 194:19-195:7, 216:2-218:7, Exh. 18]; Exh. F [Colbert Dep.

1   at 115:22-116:11, 126:2-16, 128:2-24, 130:25-131:16, 132:6-133:24, 135:1-23].   Here, Plaintiffs

2   allege, the prices charged to plaintiffs and Class Members was higher than it would have been in

3   competitive market because of the defendants' agreements not to undercut one another.

4   Third, plaintiffs' economist will testify that even if the admitted conspiracy among

5   defendants occurred only at the wholesale, full- or half-truckload level—and this is not borne out by

6   the evidence obtained—restaurant purchasers like plaintiffs experienced higher prices because of

7   defendants' agreement not to compete for any incumbent customer, including direct-to-restaurant

8   customers.  Schwarz Decl., ¶¶ 43-45.  Thus, each plaintiff and each Class Member experienced direct

9   anticompetitive harm from the absence of competition for its business.

10   Fourth, because defendants sold both to restaurants and to wholesalers that would potentially

11   compete for those same restaurant customers, plaintiffs' economist has opined that all direct-to-

12   restaurant customers were affected by the alleged (and admitted) agreement to restrict price

13   competition with respect to wholesalers that would serve as potential substitute suppliers to

14   restaurant purchaser like plaintiffs. Schwarz Decl., ¶ 24.  Thus, even if the proven price agreements

15   were limited to a conspiratorial agreement not to compete for each other's wholesale business clients,

16   each individual restaurant Class Member nonetheless suffered common harm by having lessened

17   price competition (i.e. raised rivals' costs) for direct-to-restaurant Mesquite Lump Charcoal

18   purchases between (at least) one defendant and the defendant's allocated wholesale customers.  *Ibid*.

19   Common harm of this nature supports class certification of Plaintiffs' antitrust claims here. *See In

20   re Master Key Antitrust Litig.*, 528 F.2d 5, 12, n.11 (2d Cir. 1975) ("If [plaintiffs] establish at the

21   trial for liability that the defendants engaged in an unlawful national conspiracy which had the effect

22   of stabilizing prices above competitive levels, and further establish that [plaintiffs] were consumers

23   of that product, we would think that a jury could reasonably conclude that [defendants'] conduct

24   caused injury to each [plaintiff].")

25   **4.   Plaintiffs Will Fairly and Adequately Represent The Interests of the Class**

26

27   Plaintiffs seek to be appointed as Class Representatives for the proposed Settlement Class.

28   Each plaintiff has standing to assert the antitrust claims alleged in the First Amended Complaint is

1    motivated to act on behalf of the Settlement Class.  Article III of the U.S. Constitution "requires a

2    litigant to have 'standing' to invoke the power of a federal court."  *Allen v. Wright*, 468 U.S. 737, 750

3    (1984).  To have standing, a "plaintiff must allege personal injury fairly traceable to the defendant's

4    allegedly unlawful conduct and likely to be redressed by the requested relief."  *Id.* at 751.  "At least

5    one named plaintiff must satisfy the actual injury component of standing in order to seek relief on

6    behalf of himself or the class."  *Casey v. Lewis*, 4 F.3d 1516, 1519 (9th Cir. 1993).

7         Plaintiffs have alleged and can show they satisfy the actual injury component of standing,

8    here.  Each plaintiff is a restaurant that directly purchased Mesquite Lump Charcoal from one or more

9    of the defendants during the alleged Class Period. *See* First Amend. Cmplt. [Dkt. 55], ¶¶ 7, 12, 13,

10   14; Pritzker Decl., ¶¶ 19 - 26, Exhs. G-K. Thus, like all proposed Settlement Class members, plaintiffs

11   can allege and will seek to demonstrate, through a damages expert, that they overpaid due to the

12   conspiracy among defendants and were injured by that overcharge. *See* Schwarz Decl., ¶¶ 23-24.

13        Plaintiffs are motivated to act, have acted, will continue to act on behalf of the unnamed

14   members of the proposed Class.  As described above, discovery produced in the litigation shows that

15   each plaintiff purchased significant amounts of Mesquite Lump Charcoal from the defendants during

16   the alleged Class Period.  That plaintiffs and unnamed Class Members purchased Mesquite Lump

17   Charcoal at different times or in different amounts does not mean that plaintiffs lack standing.

18   Plaintiffs may assert claims that are "typical" of other class members even though individual plaintiffs

19   or class members suffered less (or more), or suffered injuries at different times.  *Armstrong v. Davis*,

20   275 F.3d 849, 869 (9th Cir. 2001).  Indeed, typicality is easily generally satisfied in Section 1 cases

21   because "in instances wherein it is alleged that the defendants engaged in a common scheme relative

22   to all members of the class, there is a strong presumption that the claims of the representative parties

23   will be typical of the absent class members." *In re Citric Acid Antitrust Litig.*, Case No. 95-1092,

24   1996 WL 655791, at *3 (N.D. Cal. Oct. 2, 1996); *see also Labelstock*, 2007 WL 4140666, at *10

25   ("Typicality is usually satisfied in a horizontal conspiracy case, even though a plaintiff may have

26   purchased different product types or quantities or received different prices, or a plaintiff purchased

27   from one defendant but not another.")

28        Plaintiffs satisfy the adequacy requirement where the class representatives have interests that

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; MEMO. OF PTS. AND AUTHS. IN SUPPORT

are common with, and not antagonistic towards the unnamed members of the class, and will vigorously prosecute the interests of the class through qualified counsel. *See Amchem Prods, Inc. v. Windsor*, 521 U.S. at 625; *Hanlon*, 150 F.3d at 1020.  Here, the representative plaintiffs' interests are not in any way antagonistic to the Class because they are all similarly interested in obtaining valuable relief from defendants. Each of the named plaintiffs, through their representatives, have reviewed pleadings, responded to written discovery, conducted analyses of their purchases, and produced substantial numbers of documents.  Plaintiffs Il Fornaio and Enterprise Fish have each provided testimony responsive to topics identified in defendants' Rule 30(b)(6) deposition notices, on two occasions.  Plaintiff Oliveto similarly is scheduled to provide testimony responsive to two Rule 30(b)(6) notices issued by defendants on August 11, 2014. *See* Pritzker Decl., ¶ 31.[4]  Additionally, all of the plaintiffs understand the claims at issue, have kept themselves actively apprised of the litigation as it has proceeded, and have consulted with Interim Counsel's office numerous times. Pritzker Decl., ¶¶ 27 - 31, Exhs. I, J and K.

Plaintiffs are represented by counsel who are highly qualified in class action litigation and have aggressively investigated and pursued this case from the beginning. Elizabeth Pritzker of Pritzker | Law was selected to represent plaintiffs after a thorough vetting of her knowledge of the case and her prior experience prosecuting antitrust and class action. *See* Pritzker Decl., ¶ 29, Exh. I. Ms. Pritzker and her firm were appointed by the Court to serve as plaintiffs' Interim Counsel on February 27, 2014 (Dkt. 58).  Since that time, Ms. Pritzker and her firm, along with plaintiffs' co-counsel, Bruce Simon and Robert Retana of the Pearson Simon Warshaw, LLP firm have worked to prosecute this case vigorously and effectively. Pritzker Decl., ¶ 32.  Plaintiffs have adequately represented the interests of the Class thus far, and will continue to do so during the course of the litigation if appointed as Class Representatives.

### C.    The Proposed Class Satisfies Rule 23(b)(3)

In addition to the above requirements, certification of a class under Rule 23(b)(3) requires

---

[4] Plaintiffs provided several dates for a Rule 30(b)(6) deposition of Oliveto, and these originally were scheduled to take place on August 4, 2014.  This date was changed to August 11, 2014 to accommodate the defendants.  (*Id.*, ¶ 31, ftn. 4.)

1  that common questions of law and fact predominate over individual questions, and class wide

2  treatment of a dispute must be superior to individual litigation.  *Hanlon, supra,* 150 F.3d at 1022.

### 1. Common Questions of Law and Fact Predominate Over Individual Questions

5  Having met the foregoing requirements, plaintiffs are entitled to proceed with a certification

6  of a class if "the court finds that questions of law or fact common to class members predominate

7  over any questions affecting only individual members, and that a class action is superior to other

8  available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

9  In determining whether common questions of law or fact predominate, the Court must determine if

10  the various claims of the members of the proposed class are sufficiently cohesive to justify

11  adjudicating them in a single judicial forum. *See Amchem Prods.,* 521 U.S. at 625.  "Predominance

12  is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust

13  laws." *Id.*  That is because, in antitrust cases, proof of an alleged conspiracy will focus on defendants'

14  conduct and not on the conduct of individual class members."  *In re TFT-LCD (Flat Panel) Antitrust*

15  *Litig.,* 267 F.R.D. 291, 310 (N.D. Cal. 2010).  Commonality requires "some glue" holding the claims

16  together; the class claims "must depend upon a common contention" that is "of such a nature that it

17  is capable of class wide resolution."  *Wal-Mart Stores v. Dukes,* 131 S.Ct. 2541,   2545, 2551-52

18  (2011).  Indeed, "[e]ven a single [common] question will do," so long as that question has the

19  capacity to generate a common answer "apt to drive the resolution of the litigation." *Id.* at 2551,

20  2556 (internal quotations omitted).

21  Plaintiffs must establish that issues common to the Class will predominate with respect to

22  their proof of the four elements of their antitrust claim for violation of Section 1 of the Sherman Act:

23  (1) that there was a conspiracy to fix prices in violation of the antitrust laws; (2) that plaintiffs

24  suffered antitrust injury (*i.e.*, "impact") as a result of defendants' unlawful activity; and (3) the

25  amount of damages sustained as a result of the antitrust violations."  *See DRAM,* 2006 WL 1530166

26  at *7; *In re High-Tech Employee Antitrust Litigation,* 985 F. Supp. 2d 1167 (N.D. Cal.

27  2013)("Considering whether questions of law or fact common to class members . . . begins with the

28  elements of the underlying causes of action.").  Common questions predominate with respect to each

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; MEMO. OF PTS. AND AUTHS. IN SUPPORT

element because plaintiffs will establish each element through "generalized proof" which applies to the Class as a whole. *See DRAM* at *9.

Courts have frequently found that whether a price-fixing conspiracy exists is a common question than predominates because proof of an alleged conspiracy will focus on defendants' conduct and not on the conduct of individual class members." *In re. TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291, 310 (N.D. Cal. 2010) ("LCD"). Courts have held that this issue alone is sufficient to satisfy the predominance requirement. *See, e.g. In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 612-614 (N.D. Cal. 2009) ("SRAM"); *Rubber Chems.*, 232 F.R.D. at 353; *In re. Citric Acid Antitrust Litig.*, No. 95-1092,1996 U.S. Dist. LEXIS 16409, *22 (N.D. Cal. Oct. 2, 1996).

Here, common issues related to the existence and effect of the conspiracy on the prices of Mesquite Lump Charcoal, which two of the defendants have admitted to, predominate over questions arguably affecting individual Class Members. Proof of how defendants implemented and enforced their conspiracy will also be common to the class. Potential individualized damages or method of purchase do not defeat predominance. *See, e.g. In re Visa Check/Master Money Antitrust Litig.*, 280 F.3d 124, 138 (2d Cir. 2001) (citing and discussing cases); *DRAM*, 2006 U.S. Dist. LEXIS 39841, at *47 (courts may certify classes "regardless of whether some members of the class negotiated price individually, or whether differences among product type, customer class, and method of purchase existed.")

The existence a conspiracy among defendants to allocate and not compete for each other's customers, and defendants' acts in furtherance of the conspiracy, are predominate questions. To demonstrate that the alleged conspiracy existed, plaintiffs will necessary focus on the conduct of the defendants, rather than the conduct of individual Class Members. Here, plaintiffs have the admissions of three co-conspirator participants—Lord, Morgen and Colbert—about the nature and extent of the parties' anticompetitive agreement to allocate and not compete for each other's Mesquite Lump Charcoal customers, its genesis, and the mechanisms used to implement and maintain the conspiracy. Pritzker Decl., ¶¶ 13 - 17.

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; MEMO. OF PTS. AND AUTHS. IN SUPPORT

Proof of how defendants implemented, maintained and enforced the conspiracy will be common for all Class Members, because it is predicated on establishing the existence of the alleged conspiracy. *See In re Corrugated Container Antitrust Litig.*, 80 F.R.D. 244, 250 (S.D. Tex. 1978) ("The court is persuaded that the conspiracy issues—whether price information was exchanged; if it was, with what intent; whether action was taken by the defendants based on such exchanges, etc.— is susceptible of generalized proof, since it deals primarily with what the defendants themselves did and said."). Antitrust injury, particularly in a price-fixing case, is an issue common to the class because it is readily determined based on a common evidentiary showing.  The relevant legal standard in establishing an antitrust injury is demonstrating that plaintiffs suffered some harm to business or property as a result of defendant's unlawful conduct. *Reiter v. Sonotome Corp.*, 442 U.S. 330, 337-41 (1979); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, Case No. C 07-01819 CW, 2008 WL 4447592, at *5 (N.D. Cal. Sept. 29, 2008).  In this case, plaintiffs have common proof of the existence of an antitrust conspiracy that will establish liability on a class-wide basis, and an expert analysis from an economist that provides a means and methodology to prove that the conspiracy raised or stabilized the prices for Mesquite Lump Charcoal purchased by plaintiffs and other Class Members. *See, generally,* Schwarz Decl. at ¶¶ 47-89.

### 2.     Plaintiffs Have Put Forward a Plausible Methodology to Prove Antitrust Impact on a Class-Wide Basis

Following dozens of cases on this point, the courts of this district have repeatedly held:

> [D]uring the class certification stage, the court must simply determine whether plaintiffs have made a sufficient showing that the evidence they intend to present concerning antitrust impact will be made using generalized proof common to the class and that these common issues will predominate . . . Plaintiffs need only advance a plausible methodology to demonstrate that antitrust injury can be proven on a class-wide basis.

*DRAM*, 2006 WL 1530166 at *9 (internal quotation marks and citations omitted); *see generally Citric Acid*, 1996 WL 655791 at **6-8.  Importantly, "[o]n a motion for class certification, the Court only evaluates whether the method by which plaintiff proposes to prove class-wide impact could prove such impact, not whether plaintiffs in fact can prove class-wide impact. *In re Magnetic*

1  *Audiotape Antitrust Litigation*, No. 99 CIV. 1580, 2001 WL 619305 at *4 (S.D.N.Y. June 6, 2001)

2  ("*Magnetic Audiotape*").

3        Plaintiffs will rely on an overcharge analysis to prove antitrust injury.  It is well-settled that

4  an overcharge analysis constitutes an acceptable method for establishing injury in fact on a class-

5  wide basis.  See SRAM, 2008 WL 4447592 at *6-7; *Cardizem*, 200 F.R.D. at 302; *In re Visa*

6  *Check/Mastermoney Antitrust Litig.*, 192 F.R.D. 68, 82-83 (E.D.N.Y. 2000) ("*Visa*

7  *Check/Mastermoney I*"); *In re Carbon Black Antitrust Litig.*, No. Civ. A.03-10191 (DPW), 2005

8  WL 102966 at *16-17 (D. Mass. Jan. 18, 2005) ("*Carbon Black*").  Such an analysis does not depend

9  on any individualized questions.  *See Visa Check/Mastermoney I*, 192 F.R.D. at 82-83.

10        Plaintiffs retained an economist, Andrew D. Schwarz of OSKR, LLC to provide a class-wide

11  damages analysis. Pritzker Decl., ¶ 10, Exh. B. Mr. Schwarz' damages analysis is set forth in his

12  declaration, filed herewith.  The methodology used by Mr. Schwarz to calculate class-wide damages

13  is properly tied to plaintiffs' theories in this case, and is thoroughly detailed in Mr. Schwarz's

14  declaration.  *See* Schwarz Decl. at ¶¶ 47-89.  Mr. Schwarz's analysis includes case-specific inputs,

15  including (a) the quantity of goods sold by the defendants during the Class Period, (b) the prices

16  charged for Mesquite Lump Charcoal; (c) the relevant profit margin for the time period; and (d) an

17  estimates of the price elasticity of demand for the relevant market. *Id.*, ¶ 59.  Actual sales, financial

18  and pricing data provided by defendants are used in the analysis, to the extent such data are available.

19  *Id.*, ¶¶ 7, 10, 16, 19, 31, 66-68, 71-72, 75-76.  The data support plaintiffs' allegations regarding a

20  relevant market and defendants' collective market power (*see id.*, ¶¶ 33-39, 47-54) and provide a

21  basis for Mr. Schwarz to calculate estimates for market price elasticity of demand. *Id.*, ¶¶ 80-83.

22        Mr. Schwarz employs an economically sound structural model to assess the fact of and

23  amount of injury caused by the collusive activity alleged in this case. *Id.*, ¶¶ 55-63, 85-87.  Using

24  the actual-market structural variables derived from the defendant data, Mr. Schwarz calculates class-

25  wide damages based on each of two assumed price elasticity measures:  (1) -1.68 as derived from

26  California Charcoal sales data, the most complete data available; and (2) -1.31 as derived from

27  Lazzari's somewhat less-robust sales data. *Id.*, ¶¶ 87.  The average price overcharge stemming from

28  the alleged conspiracy is estimated to be 11.8 % for elasticity of -1.68, and 19.3 % for elasticity of -

1.31.  *Id.*  The resulting class-wide damages for the proposed class of direct purchasers of Mesquite Lump Charcoal range from $8.3 million (assuming price elasticity of -1.68) to $12.6 million (assuming price elasticity of -1.31) assessed on total revenues of the relevant mesquite charcoal for the 11-year class period of $78,000,000.  *Id.*, ¶¶ 16, 87-88.

### 3.    A Class Action is the Superior to Individual Litigation of Class Members' Claims

"[I]f common questions are found to predominate in an antitrust action, then courts generally have ruled that the superiority prerequisite of Rule 23(b)(3) is satisfied."  Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil Procedure* § 1781 at 254-55 (3d ed. 2004).  That is because, in price-fixing cases, "the damages of individual direct purchasers are likely to be too small to justify litigation, but a class action would offer those with small claims the opportunity for meaningful redress."  *SRAM*, 264 F.R.D. at 615.  Class adjudication is superior to individual litigation, moreover, as it promotes judicial efficiency, avoids inconsistent rulings, and more economically feasible than separate adjudications.  *See Hanlon*, 150 F.3d at 1023 ("Many claims [that] could not be successfully asserted individually…would not only unnecessarily burden the judiciary, but would prove uneconomic for potential plaintiffs."); s*ee also SRAM*, at 615.  Therefore, a class action is the superior method of adjudicating the claims in this case.

### D.    Interim Counsel Should Be Appointed As Class Counsel

"An order certifying a class action…must appoint class counsel under Rule 23(g)."  Fed. R. Civ. P. 23(c)(1)(B). The following factors are considered:  the work counsel has done in identifying or investigation potential claims in the action, counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action, counsel's knowledge of the applicable law, and the resources that counsel will commit to representing the class.  Fed. R. Civ. P. 23(g)(1)(A).  On February 27, 2014, after considering competing motions, the Court appointed Ms. Pritzker of Pritzker Law as Interim Counsel, and made specific findings in support thereof that Pritzker Law had the necessary experience in the antitrust class action field, had conducted extensive research into the case, and had sufficient resources to serve as Interim Counsel.  [Dkt No. 58, pp.4-6]  The work done by Interim Counsel since her appointment provides a substantial basis for the

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; MEMO. OF PTS. AND AUTHS. IN SUPPORT

Court's earlier finding that Pritzker Law satisfies the Rule 23(g) criterion and is well-qualified to serve as Class Counsel.  Plaintiffs respectfully requests that Elizabeth Pritzker be appointed as Class Counsel.

### E.    Notice to Class Members

Rule 23(c)(2)(B) states that, "[f]or any class certified under Rule 23(b)(3), the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice must clearly and concisely state in plain, easily understood language:

(i)    the nature of the action;

(ii)    the definition of the class certified;

(iii)    the class claims, issues, or defenses;

(iv)    that a class member may enter an appearance through an attorney if the member so desires;

(v)    that the court will exclude from the class any member who requests exclusion;

(vi)    the time and manner for requesting exclusion; and

(vii)    the binding effect of a class judgment on members under Rule 23(c)(3)."

The form of notice is "adequate if it may be understood by the average class member."  4 Conte, *Newberg on Class Actions* §11.53 (4th ed. 2002) (*See also* Dkt. 29, ¶13).

The proposed form of class notice, attached to the Pritzker Declaration as Exhibit A, satisfies this standard. A plain-English form of notice, modeled after the sample form of notice that appears on the Federal Judicial Center website (http://www.fjc.gov), and containing all the information required by Rule 23(c) and (e), will be sent by direct first-class mail to Class Members.  Individual notice by mail is the "best notice practicable under the circumstances" where class members' names and addresses "may be ascertained through reasonable effort." *Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 173 (1974); *see Covillo v. Specialty's Cafe*, 2013 U.S. Dist. LEXIS 153724, *16 (Case No. C-11-00594 DMR) (Oct. 25, 2013) (Ryu, Magistrate Judge) (approving notice form and procedure for first-class mail within ten days after receiving class members' name and address information from defendant); *In re Charles Schwab Corp. Secs. Litig.,* 2011 U.S. Dist. LEXIS 44547, *16 (Case No.

1  C 08-01510 WHA) (Apr. 19, 2011) (finally approving class settlement and finding that individualized

2  notice sent by first-class mail to class members satisfied procedural requirements of Rule 23(c)(2)

3  (for notice of class certification) and Rule 23(e)(1) (for notice of settlement) as well as the

4  requirements of due process).  Here, because Class Member's Mesquite Lump Charcoal purchases

5  are delivered to a physical mailing address, Class Member names and addresses can be readily

6  discerned from Defendants' records.  Pritzker Decl., ¶ 18.

7  **IV.    CONCLUSION**

8          Based on the foregoing, plaintiffs respectfully request that the Court: (1) certify this action as

9  a class action pursuant to Federal Rule of Civil Procedure 23; (2) appoint the named plaintiffs as

10  Class Representatives for the Class; (3) appoint plaintiffs' Interim Counsel as Class Counsel and the

11  named plaintiffs as Class Representatives for the Class; (4) direct plaintiffs to provide notice to the

12  Class as set forth in Exhibit A to the Declaration of Elizabeth C. Pritzker.

13  DATED: August 7, 2014                           **PRITZKER │ LAW**

14

15                                               By: __*/s/ Elizabeth C. Pritzker*_____
                                                      Elizabeth C. Pritzker

16
                                                 Bethany L. Caracuzzo
17                                               633 Battery Street, Suite 110
                                                 San Francisco, CA 94111
18                                               Telephone: (415) 692-0772
                                                 Facsimile: (415) 366-6110
19

20                                               *Plaintiffs' Interim Counsel*

21

22

23

24

25

26

27

28