ELIZABETH C. PRITZKER (Bar No. 146267)
ecp@pritzker-law.com
BETHANY L. CARACUZZO (Bar No. 190687)
bc@pritzker-law.com
SHIHO YAMAMOTO (Bar No. 264741)
sy@pritzker-law.com
**PRITZKER | LAW**
633 Battery Street, Suite 110
San Francisco, CA 94111
Telephone: (415) 692-0772
Facsimile: (415) 366-6110

*Plaintiffs' Interim Counsel*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

IL FORNAIO (AMERICA) CORPORATION; OLIVETO PARTNERS, LTD. and THE FAMOUS ENTERPRISE FISH COMPANY OF SANTA MONICA, INC., on behalf of themselves and all others similarly situated,

Plaintiffs,

vs.

LAZZARI FUEL COMPANY, LLC, CALIFORNIA CHARCOAL AND FIREWOOD, INC., CHEF'S CHOICE MESQUITE CHARCOAL, RICHARD MORGEN, ROBERT COLBERT, MARVIN RING, and WILLIAM W. LORD,

Defendants.

DARBAR CUISINE, INC.,

Plaintiff,

vs.

CHEF'S CHOICE MESQUITE CHARCOAL, LAZZARI FUEL COMPANY, LLC, CALIFORNIA CHARCOAL AND FIREWOOD, INC., and WILLIAM W. LORD,

Defendants.

CASE NO. 3:13-cv-05197 WHA; AND
CASE NO. 3:13-cv-05331 WHA
(CONSOLIDATED)

CLASS ACTION

**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Date: September 16, 2014
Time: 10:30 a.m.
Courtroom: 8

Judge: Hon. William H. Alsup

## TABLE OF CONTENTS

**Page**


I. INTRODUCTION .................... 1

II. LEGAL ARGUMENT .................... 2

A. PLAINTIFFS HAVE MET THEIR BURDEN UNDER RULE 23 .................... 2

1. Plaintiffs Can Show Defendants Conspired to Allocate and Not Compete for Incumbent Mesquite Charcoal Customers .................... 3

(a) Lord Admits That All Defendants Conspired Not to Compete for Customers .................... 3

(b) Morgen and Colbert Admit the Conspiracy .................... 6

(c) Defendants' Acts In Furtherance of the Conspiracy Are Well Documented .................... 6

(d) Defendants Were Not Just "Blowing Smoke" .................... 7

2. Plaintiffs Purchased Mesquite Charcoal in the Economic Market in Which Defendants Market and Sell the Product .................... 9

B. THE PROPOSED CLASS IS ASCERTAINABLE .................... 14

C. PLAINTIFFS SATISFY RULE 23(b). .................... 17

III. CONCLUSION .................... 19

## TABLE OF AUTHORITIES


Page(s)

**CASES**

*Amgen, Inc. v. Connecticut Retirement Plans & Trust Funds*, 133 S.Ct. 1184 (2013) .......... 2, 3

*Avery Dennison Corp v. Acco Brands, Inc*. 200 U.S. Dist LEXIS 3938 (C.D. Cal. Feb. 22, 2000) .......... 13, 14

*Brendt v. California Department of Corrections*, No. C 03-3174 PJH, 2012 WL 950625 (N.D. Cal. March 20, 2012) .......... 17

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) .......... 13

*Comcast Corp. v. Behrend*, 133 S.Ct. 1426 (2013) .......... 2

*Cooperweld Corp. v. Indep. Tube Corp*., 467 U.S. 752 (1984) .......... 9

*DeVoto v. Pacific Fidelity Life Ins. Co*., 618 F.2d 1340 (9th Cir. 1980) .......... 9

*Eastman Kodak Co. v. Image Technical Servs., Inc*., 504 U.S. 451 (1992) .......... 10

*Ellis v. Costco Wholesale Corp*., 657 F.3d 970 (9th Cir. 2011) (“*Ellis*”) .......... 2

*Hagen v. City of Winnemucca*, 108 F.R.D. 61 (D. Nev. 1985) .......... 16

*Houser v. Fox Theatres Management Corp*., 845 F.2d 1225 (3d Cir. 1988) .......... 14

*In re Autozone, Inc*., 289 F.R.D. 526 (N. D. Cal. 20102) .......... 16

*In re. Graphics Processing Units Antitrust Litig*., 253 F.R.D. 478 (N.D. Cal. 2008) .......... 10, 11

*In re Magnetic Audiotape Antirust Litig*., No. 99 CIV 1580, 2001 WL 619305 (S.D.N.Y. June 6, 2001) .......... 19

*In re TFT-LCD (Flat Panel) Antitrust Litig.* 820 F. Supp. 2d 1055 (N.D. Cal.2011) .......... 5, 17, 18

*In re: High-Tech Emp. Antitrust Litig.*,
985 F.Supp.2d 1167 (N.D. Cal. 2013)....2

*Klehr v. A.O. Smith*,
521 U.S. 179 (1997)....17

*Mazur v. eBay Inc.*,
257 F.R.D. 563 (N.D. Cal. 2009)....15

*Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co.*,
457 F.Supp.841 (N.D. Cal. 1979)....14

*Newcal Indus., Inc. v. Ikon Office Solution*,
513 F.3d 1038 (9th Cir. 2008)....10

*O'Connor v. Boeing N. Am. Inc.*,
184 F.R.D. 311 (C.D. Cal. 1998)....15

*Oahu Gas Serv., Inc. v. Pac. Res. Inc.*,
838 F.2d 360 (9th Cir. 1998)....10

*Pecover v. Elecs. Arts Inc.*,
633 F. Supp. 2d 976 (N.D. Cal. 2009)....10

*Rebel Oil Co. v. Atlantic Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995)....9

*Royal Printing Co. v. Kimberly-Clark Corp.*,
621 F.2d 323 (9th Cir. 1980)....11

*Rutledge v. Boston Woven Hose and Rubber Company*,
576 F.2d 248 (9th Cir. 1978)....17

*Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*,
947 F.Supp.2d 88 (D.D.C. 2013)....14

*Tampa Electric Co. v. Nashville Coal Co.*,
365 U.S. 320 (1961)....13

*Tan v. Univ. of S. Cal.*,
252 F.3d 1059 (9th Cir. 2001)....13

*Trazo v. Nestle USA, Inc.*
No. 5:12-CV-2272 PSG, 2013 WL 4083218 (N.D. Cal. Aug. 9, 2013)....15

*U.S. v. William W. Lord*,
Case No. 12-cr-00326-WHA....4

*United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*,
608 F.3d 871 (D.C. Cir. 2010)....4

*United States v. Krasn*,
614 F.2d 1229 (9th Cir. 1980) ........ 5

**STATUTES**

15 U.S.C. § 1 ........ 13, 14

Fed. R. Civ. Proc. 23 ........ 1, 2, 20

Fed. R. Civ. Proc. 23(c)(2) ........ 15

Fed. R. of Evid. 803(22) ........ 4

## I. <u>INTRODUCTION</u>

Plaintiffs Il Fornaio (America) Corporation, Oliveto Partners, Ltd., and The Famous Enterprise Fish Company of Santa Monica, Inc. ("plaintiffs"), are restaurants that purchased Mesquite Lump Charcoal, during the period January 2000 to September 2011, directly from one at least one of three California companies: Lazzari Fuel Company, LLC, California Charcoal and Firewood, Inc., and Chef's Choice Mesquite Charcoal. Plaintiffs allege that these companies, through their owners and executives (who are joined here as individual defendants), combined, conspired or agreed to allocate the market for Mesquite Lump Charcoal and not compete for incumbent customers. Such conduct is *per se* unlawful under our nation's antitrust laws. The economic consequence of defendants' misconduct is real and calculable: defendants succeeded in their conspiratorial goal to "keep the price up" and, as a result, plaintiffs paid more for Mesquite Lump Charcoal than they would have paid in a competitive market.

Plaintiffs have moved for class certification under Federal Rule of Civil Procedure 23. They have put forward credible evidence, including admissions by three of the four individual co-conspirators, about the conspiracy's existence, its unlawful goal, the efforts taken to further and police it, and its impact on defendants' customers. They have evidence that plaintiffs purchased Mesquite Lump Charcoal in the economic market in which defendants market and sell the product. And, they have shown that class wide impact and damages can be calculated using a common, formulaic method.

Defendants' arguments against certification primarily involve disputes over the nature or quantum of the conspiratorial evidence against them, and the geographical contours of the alleged product market. These are merits issues that do not require proof at the class certification stage. Nonetheless, plaintiffs have shown in their opening brief and again on reply that defendants' arguments are contrary to the evidence, and do not affect the Rule 23 analysis in any event. Defendants' remaining arguments are directed to damages issues. While plaintiffs and defendants' experts can apply this method differently, the method for calculating damages is reasonable and economically sound. Debates over "who is right" are not the province of this motion. The Court should certify the proposed Class and order that notice be sent to Class members.

## II. LEGAL ARGUMENT

### A. PLAINTIFFS HAVE MET THEIR BURDEN UNDER RULE 23

Plaintiffs are mindful that courts must engage in a "rigorous analysis" when determining whether the prerequisites for class certification—numerosity, common questions of law or fact, typicality, adequacy and predominance—are satisfied. *See Comcast Corp. v. Behrend*, 133 S.Ct. 1426 (2013) ("*Comcast*"). But, it is incorrect to equate that analysis, as defendants appear to do, with an "in-depth examination of the underlying claims." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983, n.8 (9th Cir. 2011) ("*Ellis*"). Plaintiffs are not required to prove their conspiracy allegations, or establish a likelihood of prevailing on the merits, in order to satisfy Rule 23. *See In re: High-Tech Emp. Antitrust Litig.*, 985 F.Supp.2d 1167, 1187 (N.D. Cal. 2013) (rule 23 inquiry "cannot require Plaintiffs to prove elements of their substantive case at the class certification stage"). As the Ninth Circuit made clear in *Ellis*: "The district court is required to examine the merits of the underlying claim…only inasmuch as it must determine whether common questions exist; not to determine whether class members could actually prevail on the merits of their claims." *Id.* at 657 at 983, n.8.

In *Amgen, Inc. v. Connecticut Retirement Plans & Trust Funds*, 133 S.Ct. 1184 (2013), the Supreme Court reiterated that merits inquiries are improper at class certification. The Court instructed that "Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class," and that "the office of a Rule 23(b)(3) certification is not to adjudicate the case; rather, it is to select the 'metho[d]' 'best suited to adjudication of the controversy 'fairly and efficiently.'" *Id.* at 1191 (original italics). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.*

Defendants challenge the quantum of proof that plaintiffs have about the conspiracy, its impact, and the damages flowing from that conspiracy. While this type of merits inquiry is improper under *Amgen*, plaintiffs address these questions below.

//

//

### 1. Plaintiffs Can Show Defendants Conspired to Allocate and Not Compete for Incumbent Mesquite Charcoal Customers

Plaintiffs have put forward evidence of their underlying substantive claim that defendants engaged in a conspiracy to allocate and not compete for incumbent mesquite charcoal customers. *See* Mot. [Dkt. 103] at pp.2-8. In the Joint Opposition filed by California Charcoal and its owner, Marvin Ring, together with Chef's Choice and its owner, William Lord, Mr. Lord endeavors to dismiss the significance of his plea to criminal charges of antitrust violations, and both he and Mr. Ring make efforts to "disprove" that their actions in furtherance of the alleged conspiracy were, in fact, conspiratorial. Defendants' arguments are improper under *Amgen*. They also are not supported by the evidence, or the law.

#### (a) Lord Admits That All Defendants Conspired Not to Compete for Customers

In the Joint Opposition, defendants claim that Lord never admitted to engaging in a conspiracy with California Charcoal or Marvin Ring, and that any conspiracy Lord may have engaged in was limited to two conspiratorial actions that occurred in 2004 and 2005. *See* Opp. [Dkt. 109] at 9:12-17, 11:15-12:10. This Court might be surprised by these arguments, as it was this very Court that heard Mr. Lord's allocution, and entered his guilty plea. (Tr. of Hearing at 15:2-11, Exhibit "D" to Declaration of Elizabeth C. Pritzker ("Pritzker Decl."); *see also* [Crim. Dkt. 7, 17]. In any event, the available record evidence is to the contrary.

The Court need not look further than Mr. Lord's own Sentencing Memorandum, which was prepared on his behalf by his criminal defense attorney, and filed with the Court on September 21, 2012, for admissible evidence that the co-conspirators Lord was adjudged guilty of conspiring with are Lazzari and California Charcoal, and that conspiracy went on for 10 years. As admitted there:

> **From 2000 to 2010**, Mr. Lord participated in an arrangement, **with two competitors, Lazzari Fuel Company and California Charcoal and Firewoo**d wherein each of the three companies and their principals agreed to suppress and restrain competition by:
>
> 1. Agreeing not to compete for sales of mesquite charcoal to co-conspirators' customers;
>
> 2. Refraining from submitting bids for the sale of mesquite charcoal to customers allocated to co-conspirators; and/or

> 3. Communicating regarding bid prices and then submitting agreed-upon and intentionally non-competitive bids to co-conspirators' customers.

(Defendant's Sentencing Mem., *U.S. v. William W. Lord*, 12-cr-00326-WHA [Dkt. No. 14], emphasis added; Lord Dep., Exh. 64 at 2:17-26, Exh. C to Pritzker Decl.)[1]

Lord also openly admitted, in his June 18, 2012 Plea Agreement, that he had participated in at least a 10-year conspiracy (from 2000 to September 2010) to restrain competition

> by agreeing not to compete for competitors' customers and by submitting non-competitive bids for the sale of mesquite charcoal **in the United States**, beginning **at least as early as January 2000 and continuing until in or about September 2010**, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1. By entering into this Plea Agreement, Defendant admits to knowingly committing this offense and to being guilty of this offense.

(Sanger Decl., Exh. 20, ¶¶ 2, 4(a), emphasis added; *see also* Lord Dep. at 53:16-54:17, Pritzker Decl., Exh. C.)[2]

Lord now claims that he doesn't know whether the other conspirators referenced in his Plea Agreement as "Company A" and "Individual A" were California Charcoal and Marvin Ring. (*See* Sanger Decl., Exh. 20, ¶ 4(c)).[3] At his deposition in this matter, however, Lord testified quite plainly that: (1) he understood he was pleading guilty to engaging in a conspiracy with California Charcoal and Lazzari (Lord Dep. at 55:24-57:17, Pritzker Decl., Exh. C.); (2) he understood the reference to "Company A" in the Plea Agreement to be California Charcoal and to "Individual A" to be Marvin

---

[1] While defendants complain that Mr. Lord's Plea Agreement and Judgment were not attached to plaintiffs' motion (Opp. 11:15-16), that Plea Agreement is now before the Court as part of defendants' opposition submission. (Sanger Decl., Exh. 20). The Judgment is publically available but also appears as Exh. T to the Declaration of Elizabeth C. Pritzker in support of Plaintiffs' Reply ("Pritzker Reply Decl.") The transcript of the hearing at which Mr. Lord entered his guilty plea appears as Exh. D to the Pritzker Decl.

[2] Contrary to Defendants' argument at footnote 10 of their opposition brief, Lord's criminal guilty plea may be introduced into evidence at the civil trial in this matter for use against co-conspirator defendants pursuant to Fed. R. of Evid. 803(22). *See United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 892-3 (D.C. Cir. 2010).

[3] This is not the first time that Mr. Lord has misrepresented his conspiratorial role. He repeatedly misled the FBI and denied the conspiracy until he was confronted with tape recordings obtained by federal authorities of phone calls between Lord and others (including Morgen) in which Lord spoke openly about the conspiracy, as well as Morgen's, Colbert's and Ring's participation in it. (*See* U.S. Sentencing Mem., filed in *U.S. v.Lord*, 12-cr-00326-WHA [Dkt. 13] at 10:4-17, Exh. N to Pritzker Reply Decl.)

Ring. (*Id.* at 55:24-56:23); and (3) he understood that the Agreement's references to "Individual B" and "Individual C," and to the "General Manager and part owner of Company B, a San Francisco-based company that sold and distributed mesquite charcoal throughout the United States" to be Defendants Morgen, Colbert and Lazzari, respectively. (*Id.* at 56:25-57:17.) There are numerous other references to the identities of Lord's admitted co-conspirators in his deposition testimony as well. (*See* Lord Dep. at 51:10-53:3; Lord Dep. Exh. 66 at 8:12-30, 23:22-24, Lord Dep. Exh. 66 at 8:12-30, 23:22-24; Lord Dep. Exh. 67 at 2:19-3:26 [Pritzker Decl., Exh. C]; *see also* Pritzker Reply Decl., Exhs. M and O.)[4]

Lord's suggestion that the admitted conspiracy was limited to only "two" incidents in 2004 and 2005 also finds no support – either in the Sentencing Memorandum prepared by his attorney, in the Plea Agreement, or in Lord's allocution regarding his criminal role at the time his plea was entered and he was sentenced to prison. Lord's new position is legally faulty in any event. The law is clear that a defendant who enters a conspiracy and commits even one act in furtherance of the conspiracy shares liability for the entire conspiracy. Thus, Lord and his co-defendants share joint liability for the entire course of the conspiracy, unless there is clear evidence the Lord took affirmative action to withdraw from the conspiracy. *United States v. Krasn*, 614 F.2d 1229, 1236 (9th Cir. 1980); *see also In re TFT-LCD (Flat Panel) Antitrust Litig.* ("*LCDs II*"), 820 F. Supp. 2d 1055, 1059 (N.D. Cal.2011) ("It is well-established that once a defendant joins a conspiracy it is jointly and severally liable for any actions taken in furtherance of the conspiracy. . . . This liability continues until the objectives of the conspiracy are completed, or the defendant withdraws from the conspiracy.") There is no evidence that Lord took affirmative steps to withdraw from the conspiracy. Indeed, the evidence shows that Lord would not have withdrawn at all had he not been the subject of FBI enforcement.

//

//

---

[4] Although each of the defendants had legal representation at the time (*see, e.g.,* Decl. of Jean Pierre Nogues, ¶ 17), and despite the fact that Lord's arraignment, plea and sentencing hearing were noticed on the PACER and the DOJ's Antitrust Division website, no defendant contested Lord's admission implicating them in the conspiracy.

### (b) Morgen and Colbert Admit the Conspiracy

As described in plaintiffs' opening brief, Lazzari's Richard Morgen and Robert Colbert also provided testimony about the nature and scope of the defendants' conspiracy. Morgen and Colbert both testified about a meeting at the Oakland airport in the late 1990's in which Morgen, Colbert and Lord entered into an agreement to notify each other whenever an existing customer of the other was "shopping around for prices." (Pritzker Decl., ¶ 14, Exhs. E and F.) These defendants also corroborated the lengthy nature of the conspiracy. According to Morgen, the parties' conspiratorial agreement did not end until August 2010 when Lazzari's shareholders were notified about the collusive arrangement by a Lazzari former employee, Mark Schulz. (Morgen Dep. at 126:3-17; Reply Decl., Exh. Q.) Morgen and Colbert also testified that they told Mr. Schulz about their agreement with Chef's Choice after Mr. Schulz was hired in 2009, and that they instructed Mr. Schulz not to compete with Chef's Choice or California Charcoal for mesquite charcoal customers. (Morgen Dep. at 115:19-118:8; Colbert Dep. at 139:10-140:17, Pritzker Decl., Exhs. E and F.)

### (c) Defendants' Acts In Furtherance of the Conspiracy Are Well Documented

While Morgen and Colbert denied entering into an *express* agreement with Ring and California Charcoal not to compete, both men admitted that Lazzari did not compete for California Charcoal's incumbent customers during the class period. (Pritzker Decl., ¶ 15, Exhs. E, F.) Plaintiffs' opening brief describes contemporaneous notes retained by Morgen and Colbert where Morgen, Colbert, Lord and Ring: (1) agreed not to quote to one another's mesquite charcoal customers; (2) agreed to quote another firm's customer at a higher price than a current-account holder so as not to "poach" the account from the existing firm; (3) agreed to give another firm's customer an inaccurate, pre-textual reason for not providing a price quote; and (4) exchanged proprietary cost and supplier information, revealed the identities of their non-conspiratorial competitors, discussed the prices defendants where charging existing customers, or provided advance information about anticipated or proposed price increases for mesquite charcoal. (*See, e.g.*, Morgen Dep., Exhs. 9, 10, 11, 13, 15, 16, 17, 18, 20; Ring Dep. Exhs. 49, 50, 51, 54, 55, 56; Lord Dep. Exhs. 70, 71, 72, LAZZ-00005, Pritzker Decl. Exhs. E, L and C, respectively.)

### (d) Defendants Were Not Just "Blowing Smoke"

At deposition, Lord and Ring claimed that in their more than 100 calls with each other and with Lazzari over the class period, defendants were only "blowing smoke" when they shared information about incumbent customers or discussed mesquite charcoal pricing. Opp. at 10:16-19. The record evidence is otherwise. For example, in September 2000, Lazzari agreed with Lord to submit a high quote for mesquite charcoal to Chef's Choice incumbent customer, Grills to Go. (Morgen Dep. at 189:20-191:25, Exh. 10, Pritzker Decl. Exh. E.) Similarly, in December 2000, Lazzari submitted a higher bid for mesquite charcoal to Chef Choice incumbent customer, Cardinal Restaurant Supply, located in Carpinteria, California, in December 2000. (*Id.* at 193:1-195:7, Exh. 11.) Notably, while this particular customer is located in Chef's Choice's home town, Lazzari never indicated to the customer that it would not be able to deliver mesquite charcoal to that location; it just quoted a higher price as a pretext, per Lazzari's arrangement with Lord. (*Ibid.*)

In February 2002, California Charcoal apparently ran afoul of the parties' conspiracy and sold a trailer of mesquite charcoal to Bear Bottom Farms, a Lazzari customer located in Richmond, California. Lazzari (Morgen or Colbert) phoned California Charcoal's Marvin Ring on March 19, 2002. As reflected in Lazzari's notes: "I called Marvin on 3/19/02 to let him know to call us prior to quoting [Bear Bottom Farms] as a favor to us. He agreed." (Morgen Dep. Exh. 13, Pritzker Decl. Exh. E.) According to sales records produced in discovery, California Charcoal and Ring never sold to Bear Bottom Farms after that call. (Pritzker Reply Decl., ¶ 12.)

In August 2005, a very large direct-to-restaurant client, Real Mex (the owner of the Chevy's line of restaurants), with headquarters in Union City, California, contacted Lazzari and asked for a bulk, truckload mesquite charcoal price quote. Lazzari knew that Real Mex was an incumbent customer of Chef's Choice and so, according to the parties' arrangement, Morgen or Colbert called Lord to advise him of the situation. Consistent with the conspiracy, after speaking with Lord, Lazzari returned the Real Mex call, stating that Lazzari did not have as sufficient supply of mesquite charcoal to provide Real Mex at the time. Morgen testified that this excuse was pretextual and that Lazzari did not bid the customer because of the parties' conspiratorial agreement. (Morgen Dep. at 216:11-218:7; Exhs. 17, 20, Pritzker Decl. Exh. 3.)

In 2007, Ring called Lazzari to alert Morgen and Colbert that Chef's Choice has lost the Real Mex mesquite charcoal account, and to signal to Lazzari that it could now bid the account as it no longer "belonged to" Chef's Choice. (Morgen Dep., Exh. 20.) Lazzari then bid and won the account, which offered a substantial sales opportunity for Lazzari at 2-3 truckloads of mesquite charcoal per month. (Pritzker Reply Decl. ¶ 18.) Lord learned of Lazzari's success in bidding the account, and called Morgen and Colbert to say he was "hurt" by what Lazzari had done. Lazzari explained it believed it had none nothing wrong, as Chef's Choice had lost the account. (Morgen Dep. at 225:21-226:18, 228:15-232:18, Reply Decl., Exh. Q.) Chef's Choice re-bid the account at the same price that Lazzari had offered, and won it back. Even though Real Mex's office is only 30 miles from Lazzari's headquarters, Lazzari did not submit a second bid to try to earn the business and, instead, voluntarily relinquished the account to Chef's Choice. (*Id.* at 231:14-233:13.)

There also are several documented examples of cost and price exchanges among the defendants. For example, in May 2005, Lord told Lazzari that Chef's Choice sold to mesquite charcoal delivered to customers on the California Central Coast at $9.00/bag; this pricing information is confirmed by an April 8, 2005 purchase order to a Chef's Choice customer located in Santa Maria, California (Lord Dep. 152:9-154:25, Exh. 73 [Reply Decl. Exh. P]; Morgen Dep., Exh. 13 [Pritzker Decl. Exh. E].) In another example, from July 2005, Lord provided Lazzari with mesquite charcoal pricing information for delivery to food service customers in Salt Lake City, UT, Dallas, TX and Lakeland FL, as well as direct-to-restaurant pricing information for Real Mex in Union City, CA. This information also was confirmed as accurate from Lazzari's production. (LAZZ-0005, Pritzker Decl., Exh. C; Reply Decl., Exh. R.) In yet a third example, on February 28, 2008, Ring spoke with Lazzari and told Morgen or Colbert that California Charcoal's pricing for Sysco and U.S. Foods was, at that time, $9.45 for a 40 pound bag. This pricing information also was confirmed as accurate from California Charcoal's production of its non-public price lists. (Pritzker Reply Decl., ¶ 9, Exh. U.)

Plaintiffs believe that a jury, crediting this and other common evidence, could find that the allegations regarding the nature and scope of defendants' conspiracy to allocate the market and not compete for each other's Mesquite Lump Charcoal customers are true. These are merits questions best reserved for trial.

### 2. Plaintiffs Purchased Mesquite Charcoal in the Economic Market in Which Defendants Market and Sell the Product

Plaintiffs are not required to define a market and prove market power, especially at the class certification stage. Longstanding Supreme Court and Ninth Circuit authority makes clear that plaintiffs alleging per se violations of Section 1 of the Sherman Act are not required to establish a relevant market or market power. *See Cooperweld Corp. v. Indep. Tube Corp*., 467 U.S. 752, 768 (1984) ("Certain agreements, such as horizontal price fixing and market allocation, are thought so inherently anticompetitive that each is illegal per se without inquiry into the harm it has actually caused. [Citation]. Other combinations . . . are judged under a rule of reason, an inquiry into market power and market structure designed to assess the combination's actual effect."); *DeVoto v. Pacific Fidelity Life Ins. Co*., 618 F.2d 1340, 1344-45 (9th Cir. 1980) ("A crucial aspect of a plaintiff's case under the rule of reason is a demonstration that the alleged conduct of the defendant had some market impact. . . . Unless the alleged anticompetitive conduct is per se unreasonable, the fact that the conduct restrained trade in a relevant market is an essential part of a plaintiff's case[.]") (internal citations omitted, emphasis added.)

Defendants claim this "exact argument was rejected" in *Rebel Oil Co. v. Atlantic Richfield Co*., 51 F.3d 1421, 1443-44 (9th Cir. 1995), but that is incorrect. To begin with, *Rebel Oil Co*. was an individual competitor case, not a class action. Furthermore, it involved entirely different allegations than those at issue here. In *Rebel Oil Co*., the plaintiff alleged that the defendant engaged in predatory, below-cost price fixing that caused it antitrust injury. The Court held that the plaintiff was unable to show antitrust injury because it did not show that the defendant had market power. *Id.* at 1444. In so holding, the Court observed that "[p]er se rules relieve plaintiffs of the burden of proving anticompetitive effects, which are assumed, but they do not excuse plaintiffs from showing that their injury was caused by the anticompetitive aspects of the illegal act," and made the unremarkable statement cited by defendants that the plaintiff "confuse[d] proof of liability with proof of antitrust injury." *Id.* This rationale is inapplicable here, where plaintiffs allege customer allocation and agreements not to compete for customers, classic per se violations that caused anticompetitive injury to them and similarly situated class members.

Moreover, market definition is a question of fact inappropriate for resolution at this stage of the case. *See Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 453 (1992) ("The proper market definition in this case can be determined only after a factual inquiry into the 'commercial realities' faced by consumers."); *Oahu Gas Serv., Inc. v. Pac. Res. Inc.*, 838 F.2d 360, 363 (9th Cir. 1998) ("Our previous decisions establish that both market definition and market power are essential questions of fact."). Even defendants' cited authority recognizes that the existence of a relevant market is typically a factual question to be decided at summary judgment or trial. *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008). Thus, to the extent the Court must engage in a market analysis, it need not do so now. *See, e.g., Pecover v. Elecs. Arts Inc.*, 633 F. Supp. 2d 976, 983 (N.D. Cal. 2009) (deferring market analysis under rule of reason because such a "factual inquiry" was "improper" on a motion to dismiss, as it is on a motion for class certification).

Despite these authorities, defendants persist in arguing that plaintiffs have not established a relevant nationwide product market for all class member Mesquite Lump Charcoal sales. While defendants concede a national Mesquite Lump Charcoal market exists, at least for some subset of "Wholesale Truckload Sales," they try but cannot articulate whether "Local Delivery" markets in fact exist or, if they do, what their geographic or product scope may be.

These failures are not surprising. The overarching goal of defendants' businesses is to get Mesquite Lump Charcoal into *restaurants*. Lazzari specifically promotes its Mesquite Lump Charcoal, which it sells in both 20 and 40 pound bags, as "restaurant grade," and states on its website that this charcoal product "has been a coast to coast standard of America's finest *restaurants* for decades." *See http://www.lazzari.com/food-mesquite-lump-charcoal.html* (last accessed on 8/28/2004) (emphasis supplied). Lord understood that his products were designed for use in restaurants when he selected the name "*Chef's* Choice Mesquite Charcoal" as his DBA. Ring also understands that the primary end-user of his products are restaurants: he chose the name "*Chef's* Delight" as his product brand.[5]

[5] For these reasons, and others, *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, (N.D. Cal. 2008) is distinguishable. In that case there was evidence that Apple and Dell had complicated contracts with defendants that rendered them distinct from the individual plaintiffs. Here, defendants

It is therefore no surprise that each defendant sold Mesquite Lump Charcoal directly to restaurants during the Class Period. Plaintiffs are all restaurants that purchased Mesquite Lump Charcoal directly from one of the defendants during the Class Period.[6] Two of the plaintiffs—Oliveto and Enterprise Fish, respectively—maintain restaurants near the cities in which defendants—Lazzari and California Charcoal, respectively—are located. Il Fornaio has several restaurant locations, and frequently purchased its Mesquite Lump Charcoal from a locally-situated defendant—here, Lazzari and California Charcoal. But, Il Fornaio also has (or once had) restaurants that are located well outside of defendants' places of business. This geographic distance at times exceeded 640 miles (the distance between Lazzari's Brisbane, California warehouse and Il Fornaio's Portland, Oregon location), yet this factor posed no geographic or economic obstacle to Lazzari's ability to deliver smaller quantities of its "restaurant-grade" Mesquite Lump Charcoal directly to this location on a bi-monthly basis. (*See* Nogues Decl., Exh. 8, pp 133-136.) These market realties refute defendants' contention that the "Local Delivery" market for restaurants like plaintiffs in inherently local in scope.

Defendants' own expert concedes that the economic barriers to nationwide delivery of Mesquite Lump Charcoal to restaurants or others, are "low" to "extremely low." (Garrett Decl., ¶ 22, n. 5.) Notwithstanding this, California Charcoal constructs a series of regional "product markets" which it claims are economically distinct from one another, positing four distinct markets: (a) a defendant-wide "Wholesale Truck Market" defined as a truckload quantity (1,100 bags/44,000

---

have submitted no such evidence. Here, in contrast to GPU, the product (Mesquite Lump Charcoal) purchased by distributors and restaurants is the same, and defendants' goal is to get the product into restaurants. In addition, plaintiffs here *have* provided a viable method to show common impact across the proposed class, which is also distinguishable from GPUs.

[6] Chef's Choice notes in its submission that no named plaintiff purchased Mesquite Lump Charcoal directly from that entity during the Class Period. (Opp. 7:1-2.) But, this does not defeat plaintiffs' Article III standing. The Ninth Circuit has long held that so long as a plaintiff has standing based on its purchased from any conspirator, it has standing to sue all alleged members of the conspiracy on the theory of joint and several liability. *See, e.g.*, *Royal Printing Co. v. Kimberly-Clark Corp.*, 621 F.2d 323, 327 (9th Cir. 1980). Coincidently, an affiliate of plaintiff Enterprise Fish located in Santa Barbara, California did purchase Mesquite Lump Charcoal from Chef's Choice during the Class Period. (Pritzker Decl., p.6 n.2.) The Santa Barbara restaurant is a separate corporate entity and not a named plaintiff here. Plaintiffs will ably represent the interests of this putative class member if the Class is certified and they are appointed representatives for the Class. (*Ibid*.)

pounds) of Mesquite Lump Charcoal sold directly to distributors from Nogales, Arizona; (b) a California Charcoal Less than Full Truckload (LTTL) "Local Delivery Market" described variously as deliveries of "10-30" or "15-35" bags of Mesquite Lump Charcoal delivered to restaurants within a 75-90 mile radius of California Charcoal's Commerce, California warehouse; (c) a Chef's Choice LTTL "Local Delivery Market" described as similar-sized deliveries to restaurants in the 46-mile long drive between Goleta and Oxnard, California[7]; and (d) a Lazzari LTTL "Local Delivery Market" consisting of "10-30" or "15-35" bags of Mesquite Lump Charcoal delivered to restaurants with no specific geographic location other than "Northern California." (Opp. at 4:22, 5:3-4, 14-15, 20:2-4.)

The problem is that these constructions fail to consider the realities of defendants' own transactional data. And, his problem exists at both ends of defendants' argument. There are, for example, millions of dollars of sales transactions by defendants that involve LTTL Mesquite Lump Charcoal sales to wholesaler distributors around the country (including within each defendants' prescribed "Local Delivery" zones): are these sales in defendants' "national" or "local" market? California Charcoal has not delineated them. There also are millions of dollars of sales transactions by defendants involving direct-to-restaurant deliveries that exceed 35 bags of delivered Mesquite Lump Charcoal. These sales also do not fit within defendants' construct. Additionally, there are millions of dollars of sales transactions by defendants involving direct-to-restaurant deliveries outside of the prescribed "Local Delivery Markets" California constructs (such as Portland Oregon, for Lazzari (Il Fornaio restaurant); Honolulu, Hawaii for California Charcoal (Koala Moa restaurant); and Union City, California for Chef's Choice (Real Mex, owner of Chevy's and El Torito chain of restaurants).) These sales clearly are not "Local Delivery" sales as California Charcoal has defined

---

[7] It is unclear whether Chef's Choice adopts California Charcoal's argument in this regard. Lord essentially concedes his business is a nationwide business, even though California Charcoal's claims that Lord's business consists *solely* of truckload (or half-truckload) deliveries finds no support in the record. Lord testified that personally delivered Mesquite Lump Charcoal to restaurants in the areas of his home in Carpinteria in the early 2000's, but later "moved his restaurant customers over to his food service customers" when he no longer wished to perform these deliveries on his own. (Lord Dep. 262:22-263:23, 264:20-265:10; 268:25-269:12, Reply Decl., Exh. P.) Chef's Choice records, which are handwritten and difficult to review, show at least 120 transactions of Mesquite Lump Charcoal in LTTL quantities outside the Oxnard-Goleta area between 2004 and 2011. (Pritzker Reply Decl., ¶ 6.)

those markets. By necessity, and under California Charcoal's own construct, they must fall within a nationwide product market.

Defendants other case authorities are unpersuasive and not point. *Tan v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001), was not a class action. There, the court rejected plaintiff's argument that the relevant market for Sherman Act, 15 U.S.C. § 1, claim that was limited to Los Angeles (for possible schools she could transfer to) in light of her personal preference for being Los Angeles because her family was there. In fact, the court found that the evidence "strongly suggested" that the geographic market was national in scope because Tanaka had been previously recruited by schools across the country. *Id.* at 1064. *Tan* is not an antitrust case, and says nothing about the relevant product market for antitrust purposes. But, *Tan* also is distinguishable for another reason. Plaintiffs, here, do not circumscribe the geographic market based on "personal preferences." All things being equal, plaintiffs' desire is to purchase Mesquite Lump Charcoal at the cheapest price possible. The size of the truck on which it is delivered, and by whom, are not relevant considerations. (*See* Mazzon Dep. at 319:25-320:7, 323:5-17, 441:22-24, B.Choi Dep. at 91:2-22, Rhodehamel Dep. at 121:11-16, Exhs. V, X, Y to Pritzker Reply Decl., respectively.)

*Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961), also cited by defendants, provides no assistance here, as it was not a class action and involved the analysis of what is considered in the "line of commerce" for an exclusive-dealing arrangement claims under § 3 of the Clayton Act. *Id.* The Court merely indicated that the line of commerce must be carefully charted. *Id.* Defendants also cite *Avery Dennison Corp v. Acco Brands, Inc*. 200 U.S. Dist LEXIS 3938 (C.D. Cal. Feb. 22, 2000), but it also is not on point as it was not a class action and involved the analysis of plaintiff's 15 U.S.C. § 2, not § 1, claim at the summary judgment phase. The Court held that there was no dispute that there was a relevant product market as to machine labels, but that the issue was whether that market should be further defined as machinable labels to commercial customers. "Within a broad market, well-defined submarkets may exist, which, in themselves, constitute product markets for antitrust purposes." *Id.* at *34, citing to *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). The court found that these issues should go before the jury. *Id.* The Court similarly found that the

issue of whether the relevant geographic market was North America and Europe (as asserted by Avery) or just the United States (as posited by Acco) was also for the jury to decide. *Id.* at 36-37.

*Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*, 947 F.Supp.2d 88, 104 (D.D.C. 2013) was not a class action and has no bearing on plaintiffs' motion. In the case, defendant moved dismiss on the grounds that plaintiff failed to state a claim under either its group boycott Sherman Act § 1 claim, or its monopoly power violation § 2 claim. The analysis upon which defendants here rely was the court's analysis of Sky Angel's monopoly claims and whether Sky Angel's "bare allegation" that the relevant market involved all 50 states was adequate. *Id.* at *104. The continuation of the Court's ruling "quoted" by defendants in their Opp. at 18:9-12 is that, while it is not plausible that purchasers turn to a nationwide market in selecting their multi-channel video programming services, it is conceivable that Sky Angel operates nationwide and competes in individual metropolitan and regional markets comprising the entire United States. *Id.* The Court held that Sky Angel had failed to adequately plead that market and the granted them leave to do so. *Id.* [8]

**B. THE PROPOSED CLASS IS ASCERTAINABLE**

To be manageable, the membership of the class needs to be sufficiently well defined at the outset to permit meaningful notice to be given. Fed. R. Civ. Proc. 23(c)(2). It is necessary that the Court at the time of judgment be able to identify the class members in order to determine who will be entitled to relief and bound by the final judgment. *Manual for Complex Litigation* (Third) § 30.14 (1995). Defendants contend that the class definition does not meet the ascertainability standard because (1) although the term "Mesquite Lump Charcoal" is defined in the First Amended Complaint, it is not clear from the proposed class definition which products are at issue in the alleged conspiracy; (2) the inclusion of purchasers from defendants' unidentified "subsidiaries and co-conspirators" in

---

[8] Defendants' remaining authorities are also not class action cases and are similarly unhelpful. In *Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co.*, 457 F.Supp.841 (N.D. Cal. 1979), the motion before the court was a motion for judgment notwithstanding the verdict or in the alternative motion for a new trial after a jury trial. The analysis defendants cite is regarding plaintiff's claims of monopoly power violations and there was no dispute regarding the relevant market. *Id.* at 849. *Houser v. Fox Theatres Management Corp.*, 845 F.2d 1225, 1230 (3d Cir. 1988) involved an appeal of an entry of summary judgment regarding defendant's alleged monopoly power over the exhibition of first-run films between small theater owners. *Id.*

the proposed class makes ascertainment impossible; (3) it is not clear from the definition which purchasers other than food service and restaurant business are included; and (4) the proposed class period renders the class definition indefinite. (Opp. at 24:16-25:22.)

A class definition is sufficient if the class description is "definite enough so that it is administratively feasible for the court to ascertain whether an individual is a member." *O'Connor v. Boeing N. Am,. Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998). The class definition includes all direct purchasers of Mesquite Lump Charcoal from any defendant, and/or their subsidiaries and co-conspirators. Mesquite Lump Charcoal is defined in the First Amended Complaint as "mesquite charcoal that is packaged, marketed and sold in for restaurant or food service use." [Dkt. No. 75, ¶ 4.] Thus, class members can be ascertained through objective criteria. Notice will be sent to Class members using defendants' own records and the records of class members. (Motion at 10:27-11:1; 26:4-6.) It will contain the class definition and the definition of Mesquite Lump Charcoal and direct class members to a dedicated website for more information making the definition definite enough to be administratively feasible in determining who is a class members.

Defendants cite to inapposite authority to argue that the class definition does not meet the ascertainability requirement. *Trazo v. Nestle USA, Inc*. No. 5:12-CV-2272 PSG, 2013 WL 4083218 (N.D. Cal. Aug. 9, 2013), involved a putative class action involving allegedly mislabeled food products. The Court granted a motion to dismiss, *inter alia*, given that the plaintiffs' claims included nine disparate misbranding theories which involved different legal and factual questions. *Id*. at *13. The case has no application, the as only product here is Mesquite Lump Charcoal. Moreover, *Trazo* includes no discussion of the requirements for a class definition.

In *Mazur v. eBay Inc.*, 257 F.R.D. 563 (N.D. Cal. 2009), the proposed class definition consisted of two sets of people. The first was found to be "both objective and likely readily ascertainable through records kept by defendants." *Id.* at 567. Thus, it supports the proposed class definition here, which is also ascertainable through the records of defendants. Defendants focus on the second set of plaintiffs, which the Court found was imprecise because it included customers who were not harmed as alleged in the complaint. *Id.* However, as in *Mazur*, the use of defendants' records (coupled with a notice mailed to class members which includes a detailed description of who

is a member of the class) makes the class definition readily ascertainable. The proposal for mail notice also obviates any concern that the definition includes those who have not been harmed by the alleged conspiracy.[9]

Defendants claim that there are various sizes of bags of Mesquite Lump Charcoal that are sold but are not part of the proposed Class, yet purchasers of those sizes may believe they are included based on the Class definition. However, they note that 7 and 10 pound bags are sold to supermarkets and home improvement stores. (Opp. at p. 25, n.16.) Thus, those bags fall outside of the definition of Mesquite Lump Charcoal as they do not involve direct purchases for restaurant or food service use. While most proposed Class Members are restaurants and foodservice distributors that buy 40 pound bags, some buy 20 pound bags. *Id*. Lazzari does sell 20 lb. bags, so direct purchases of those bags would be included in the proposed Class even if California Charcoal and Chef's Choice do not sell that size. The concern about the inclusion of those who have not been harmed, therefore, is not supported by defendants' own description of the various bag sizes of Mesquite Lump Charcoal.[10]

Defendants' final argument regarding the proposed class definition is that the proposed class period renders it indefinite because the issue of fraudulent concealment requires individual analysis. (Opp. at 25:8-22.) This same argument was rejected in *TFT-LCD*, where the Court noted that

---

[9] *In re Autozone, Inc.*, 289 F.R.D. 526 (N. D. Cal. 20102), also cited by defendants, involved a proposed subclass—in a suit for failure to reimburse business-related expenses—who never sought reimbursement. *Id.* at 545. The proposed subclass was overbroad absent some evidence that the defendant knew or should have known that they incurred business related expenses. *Id.* Again, the proposed class definition here is not overbroad as it does not include class members who have not been damaged for the reasons stated above.

[10] Defendants further argue that the inclusion of purchasers from defendants' unidentified "subsidiaries and co-conspirators" makes ascertainment impossible. (Opp. at 25:3-5.) In *TFT-LCD Antitrust Litigation*, 267 F.R.D. 291 (N.D. Cal. 2010) ("*TFT-LCD*"), the Court granted the motion for class certification, but found that the inclusion of unnamed co-conspirators in the class definition presented ascertainability issues. *Id*. at 299. Thus, the court ordered that the class definition and the notice specifically identify the co-conspirators and affiliates. *Id*. No subsidiaries or co-conspirators are identified in the proposed definition or class notice. Therefore, as in *TFT-LCD*, should the court agree that the class definition is not sufficiently definite, the Court has the power to modify class definitions to make them more definite. *See also Hagen v. City of Winnemucca*, 108 F.R.D. 61, 64 (D. Nev. 1985). Plaintiffs respectfully request that the Court modify the class definition (or allow Class Counsel to modify it) should it deem it necessary to specifically identify any subsidiaries or co-conspirators or delete those references.

common issues would predominate with respect to whether fraudulent concealment tolled the statute of limitations, and, to the extent there were individualized issues, they could be adjudicated in a later phase. 267 F.R.D. at 310. The Court noted that "… the issue of the fact of concealment is the predominant question . . . because the inquiry necessarily focuses on the defendants' conduct, that is, what the defendants did, rather than what the plaintiffs did." *Id.*

*Rutledge v. Boston Woven Hose and Rubber Company*, 576 F.2d 248, 250 (9th Cir. 1978), cited by defendants, is not a class action case. Instead, the Ninth Circuit affirmed dismissal of the plaintiffs' case where, under the circumstances particular to that case, the plaintiff could not successfully assert fraudulent concealment to avoid the statute of limitations bar. *Klehr v. A.O. Smith*, 521 U.S. 179, 180 (1997), another non-class action, involved a motion for summary judgment which was granted, and then affirmed, based on the plaintiffs' lack of diligence in discovering their claim. It nowhere holds that the issue of fraudulent concealment makes a proposed class definition indefinite. *Brendt v. California Department of Corrections*, No. C 03-3174 PJH, 2012 WL 950625 (N.D. Cal. March 20, 2012), involved a class action alleging sexual harassment committed against female correctional officers and employees of various CDC institutions. There, the proposed class definition spanned 23 years—back to 1989—even though the relevant statute of limitations began to run in 2002. *Id.* at *12. It contains no analysis or discussion of fraudulent concealment. Defendants have thus failed to provide the Court with any apposite authority for this argument; rather, *TFT-LCD*, cited by defendants, considered and rejected this very argument. This Court should do the same.

Finally, defendants conclude without citing to any authority that the nature of plaintiffs' antitrust claims requires individual analysis making the class unascertainable. (Opp. at 26:1-4.) Plaintiffs respectfully refer the Court to the line of cases that hold that antitrust class actions are appropriate for class certification. (Motion at 9:19-10:1.)

### C. PLAINTIFFS SATISFY RULE 23(b).

Plaintiffs have demonstrated, both in their opening brief and here, that common questions of fact or law predominate over questions affecting only individual class members. Antitrust cases in this district frequently find that conspiracy determinations are common questions that focus on defendants' conduct and not on the conduct of individual class members. *In re TFT-LCD (Flat Panel*

*Antitrust Litig.*, 267 F.R.D. 291, 310 (N.D. Cal. 2010); *Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 612-14 (N.D. Cal. 2009). Here, common issues related to the existence of the conspiracy, and its effect on the prices of Mesquite Lump Charcoal, predominate over questions arguably affecting individual Class Members. Examples of the proof about how defendants implemented and enforced their conspiracy are described in the earlier sections of this brief, as well as in plaintiffs' opening brief. That proof will be common to the class.

Defendants' single argument on the issue of predominance involves plaintiffs' proposed methodology to prove antitrust impact and class-wide damages. While the Opposition Memorandum is filled with much rhetoric about the "reasonableness" or "scientific basis" of the methodology plaintiffs propose for calculating class damages (*see* Opp. at p. 29), this is not really the basis for defendants' critiques. The methodology proposed by plaintiffs and their expert is based on a peer-reviewed article published in the *Antitrust Law Journal*, and has support in a long-line of support, including in the U.S. Department of Justice enforcement guidelines, in other academic journals and in the courts. (Schwarz Decl., ¶¶ 55 - 66; Rebuttal Schwarz Decl., ¶ 17 -19.) The methodology, itself, is both structurally sound and reasonable. It is therefore not surprising that defendants' expert, Dr. Daniel Garrett, did not criticize plaintiffs' damages methodology, either in his rebuttal declaration or at deposition. (*See* Garrett Dep., at 57:1 –59:11, Nogues Decl., Exh. 16.)

Instead, the Court is faced with competing expert declarations—both from respected professional economists—that, reduced to their essence, discuss the different ways to implement the methodology and what inputs may be used in doing so. (*See* Rebuttal Schwarz Decl., ¶¶ 22 - 30; Garrett Decl., ¶¶ 31 - 57.) In his rebuttal expert declaration, Mr. Schwarz evaluates and analyzes the inputs that Dr. Garrett proposes. Mr. Schwarz believes one of Dr. Garrett's proposals—to include certain "in bound freight costs" in Mr. Schwarz's Cost of Goods Sold ("COGs") calculations of marginal costs--to be reasonable and, adopting it *arguendo*, demonstrates that class damages are calculable using a formulaic approach that incorporates Dr. Garrett's revision. (Rebuttal Schwarz Decl., ¶ 27 - 30.) This one revision also eliminates most of Dr. Garrett's other criticisms and, thus, lends further credence to the appropriateness of plaintiffs' damages model. (*Id.* at ¶¶ 11-26, 45.)

Defendants also suggest that Mr. Schwarz's calculation is "flawed" (*see* Opp. at p.35) but,

again, this vastly overstates the positon of defendants' expert. Mr. Schwarz's elasticity calculation is not flawed. Mr. Schwarz remains of the opinion that the elasticity estimates in his original declaration were appropriate calculated and controlled for, using appropriate regression analyses suitable to the data set at hand. This data, for Lazzari at least, is incomplete and available, if at all, only in aggregate form. (Rebuttal Schwarz Decl., ¶¶ 30 – 41.) To provide clarity, Mr. Schwarz relates in his rebuttal declaration where he believes Dr. Garrett erred in using his own alternatively proposed regressions, and adds corrections. (*Id*. at ¶¶ 22 – 27, 30, 33 - 36, 40 -48.)

Finally, while neither plaintiffs nor their expert agree with defendants that there are geographically distinct economic markets for defendants' Mesquite Lump Charcoal, purely for analytical purposes, Mr. Schwarz uses his proposed Structural Simulation Approach to estimate damages assuming, *arguendo*, both a national product market and two, distinct geographic product markets: one in Southern California and a second in Northern California. (Rebuttal Schwarz Decl., ¶ 50 – 58.) This is not to say that plaintiffs agree with defendants that there are multiple distinct markets. They do not. In each of these analytical *arguendo* models, however, damages can be estimated on a class (or subclass) basis using common, formulaic formulas. (*Id.* at ¶¶ 58 – 64.)

"On a motion for class certification, the Court only evaluates whether the method by which plaintiff proposes to prove class-wide impact or could prove such impact, not whether plaintiffs in fact can prove class-wide impact." *In re Magnetic Audiotape Antirust Litig*., No. 99 CIV 1580, 2001 WL 619305 at *4 (S.D.N.Y. June 6, 2001). Plaintiffs have put forward an economically sound structural model to assess the fact of and amount of injury caused by the collusive activity alleged in this case. Defendants do not dispute that this methodology is a reasonable, formulaic and economically appropriate means of calculating class damages in this matter. (*See* Schwarz Decl., at ¶¶ 47-89; Garrett Dep. 57:19-59:11; Rebuttal Schwarz Decl., ¶¶ 17 - 19.) Plaintiffs have made their required showing under Rule 23. Plaintiffs will continue to refine their damages analysis as the merits discovery of the case continues and the quality of available transactional data improves. (See Rebuttal Schwarz Decl., ¶¶ 5, 38.)

**III. <u>CONCLUSION</u>**

Defendants do not contest that plaintiffs satisfy Rule 23's requirements for numerosity, adequacy or commonality. Plaintiffs have demonstrated that they satisfies these Rule 23 mandates, and all others. The proposed class is ascertainable. Common evidence is available to establish the elements of the claims, and class damages and impact can be proven using a sound, formulaic methodology. Accordingly, plaintiffs respectfully request that the Court certify this action as a class action pursuant to Federal Rule of Civil Procedure 23.

DATED: August 28, 2014

**PRITZKER | LAW**

By: __*/s/ Elizabeth C. Pritzker*________
Elizabeth C. Pritzker

Bethany L. Caracuzzo
633 Battery Street, Suite 110
San Francisco, CA 94111
Telephone: (415) 692-0772
Facsimile: (415) 366-6110

*Plaintiffs' Interim Counsel*